938 So.2d 1111 (2006)
STATE of Louisiana, Appellee
v.
Aaron C. WILSON, Appellant.
No. 40,767-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2006.
*1116 Capital Appeals Project by Marcia A. Widder, for Appellant.
Paul J. Carmouche, District Attorney, Suzanne M. Owen, Traci A. Moore, Catherine M. Estopinal, Assistant District Attorneys for Appellee.
Before WILLIAMS, DREW and MOORE, JJ.
MOORE, J.
Aaron Wilson was convicted of one count of first degree murder and sentenced to death in August of 2002. Because Wilson was 17 years old at the time of the offense, the decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), required the Louisiana Supreme Court to vacate Wilson's death sentence and remand this case to the district court with instructions to sentence Wilson to life imprisonment without parole, probation or suspension of sentence. State v. Wilson, XXXX-XXXX (La.3/30/05), 899 So.2d 551. After the district court imposed that sentence, Wilson lost his right of direct appeal to the supreme *1117 court, La. Const. art. 5, § 5(D), so he now appeals to this court pursuant to La. Const. art. 5, § 10(A). We affirm.

FACTS
On December 23, 2000, Ms. Vicki McGraw, age 48, planned to spend the evening having dinner with her boyfriend at the Southern Oaks apartment complex on 70th Street in Shreveport, Louisiana. Ms. McGraw had been out shopping but had completed her errands and was on her way back that evening. She was alone in her SUV.
Four young men, including Aaron Wilson, who was age 17 at the time of the offense, were also driving around in this area at the same time. The men, Wilson, Derrick "Monster" Bouya,[1] Leon Bagley and Torrius "Boo" Scroggins, intended to rob and/or carjack a victim that night. They observed that Ms. McGraw was alone in her vehicle and followed her into the apartment complex's parking lot. Among them, they carried two firearmsa Lorcin .380 pistol and a Norinco MAK-90 semiautomatic rifle.[2]
As Ms. McGraw parked, Bagley, who was driving, pulled in behind her. The defendant and 21-year-old Derrick Bouya got out of Bagley's car and, displaying the weapons, confronted Ms. McGraw. Wilson and Bouya forced Ms. McGraw back into the driver's seat of her vehicle; meanwhile, Bagley and Scroggins left the scene in their car. Wilson got into the back seat of the SUV, and Bouya got into the front passenger seat.
Wilson and Bouya forced Ms. McGraw to drive to a drive-up automated teller machine where she withdrew money and surrendered it to the men. Bouya then got into the driver's seat. They put gas in the SUV and decided to drive out into rural Caddo Parish to an area near where Bouya's girlfriend's parents lived. As Bouya drove out of town, Wilson forced Ms. McGraw, now in the back of the vehicle, to submit to oral, vaginal and anal sexual intercourse. The trauma of the incident caused Ms. McGraw to lose control of her bowels, and she defecated on the back seat of her vehicle. She pleaded with the men to stop to allow her to use the bathroom. Bouya stopped the SUV on a remote stretch of Louisiana Highway 169. Ms. McGraw got out of the passenger-side door of the two-door vehicle and stayed on that side of the vehicle. As Ms. McGraw relieved herself beside the vehicle, the defendant shot her in the top of the head with the Lorcin, killing her. Wilson and Bouya left Ms. McGraw's body where it lay in the leaves by the side of the road and fled the scene in the SUV. During the ride back to town, Wilson accidentally discharged the MAK-90 and shot a hole through the roof of the SUV.
A passerby found Ms. McGraw's partially nude body the morning after the murder. The Caddo Parish Sheriff's Office (CPSO) investigated the crime and quickly developed suspects; over the few days after the murder, various persons used Ms. McGraw's credit cards (to buy clothing and jewelry), her cell phone, and drove her vehicle around town, involving it in an accident. The investigation quickly focused on Bouya and the defendant.
After Bouya was apprehended, Wilson came into the Shreveport Police Department headquarters. Using a false name, Wilson attempted to give Bouya, and himself, *1118 an alibi. CPSO investigators determined that Wilson was not who he claimed to be. Thereafter, he gave a statement at a CPSO office. In his statement, Wilson admitted to the kidnapping, robbery, and rape (with the exception of the anal rape, which he denied) and further admitted that he was the person who shot Ms. McGraw.
Wilson told investigators that he only intended to frighten Ms. McGraw with the gunshot and fired the shot only because Bouya said "[D]o her, `cause she seen our face, do her." He described the details of the shooting to the investigators; however, he claimed that he intended to fire the gun over the victim's head, closing his eyes when he squeezed the trigger.
Wilson was charged with first degree murder and the state sought the death penalty. The matter proceeded to trial by jury on August 5, 2002.
Wilson's trial strategy was aimed at avoiding a conviction for first degree murder. He testified and admitted participation in the kidnapping, robbery and (vaginal) rape but denied that he had the specific intent to kill or inflict great bodily harm upon Ms. McGraw. Indeed, at trial Wilson denied that he was the person who shot Ms. McGraw. The defendant testified that he lied to police about being the shooter because he was afraid of retaliation from Bouya against his (Wilson's) mother if he told the truth.
Wilson claimed that Bouya shot Ms. McGraw while still sitting in the SUV. Wilson admitted that he was outside the truck and standing near the victim when she was killed. Ms. McGraw was squatting close to the truck with her back to him, and he said he was not watching when Bouya fired the fatal shot. At trial, Wilson testified that
Like after, right about two or three minutes after she got out I'm standing there, you know, turning the bottle up, and the second time I bring it down I hear a click, and when that click, you hear, boom, I turned around and I jumped and I said "Man, what's up, bro, what just happened?" He say, "Man, I had to do it, bro, she seen our face." I say, "Man, take me home, bro, take me home." He said, "Man, come on, man, I know you ain't going to act like no," basically excuse my language, but "I know you ain't going to act like no bitch on me." I say, "Man, just take me home, bro." So he say, "Come on, get in, homeboy." . . .
Photos of the crime scene, the vehicle and the final position of Ms. McGraw's body were introduced into evidence and shown to the jury. Dr. Stephen Cogswell, deputy coroner for Caddo Parish, testified that the entrance wound was at the left back of Ms. McGraw's head, that the bullet path was downward, somewhat forward and very slightly to the left. The autopsy photo shown to the jury shows the entrance wound to be nearly in the center of the victim's skull. The coroner said that this wound was consistent with the victim having her head down, assuming that the person who shot her was in front of her. The coroner also testified that swabs for semen were positive in Ms. McGraw's mouth and vagina and that she had damage to her anus consistent with penetration. DNA from the vaginal swab matched the defendant. The spent shell casing from the handgun was never found.
The jury, having heard the coroner testify about the angle of the gunshot wound and having seen photos of the scene, disbelieved Wilson's testimony and convicted him of first degree murder. As noted, the jury also concluded that the death penalty was appropriate for Wilson, who was only weeks away from his 18th birthday when he kidnapped, robbed, raped and murdered Ms. McGraw.

*1119 DISCUSSION
By his first assignment of error, the appellant contended that the incomplete state of the appellate record violated Mr. Wilson's rights to due process, effective assistance of counsel, and appellate review under the state and federal constitutions.
As originally constituted, the appellate record was missing a substantial portion of the transcript from voir dire. That omission has been corrected, and appellant concedes that this error is now without merit.
Sufficiency of Evidence
During the guilt phase of the trial, the only disputed issue was whether Wilson had the specific intent to kill or inflict great bodily harm upon Ms. McGraw so as to warrant a conviction under La. R.S. 14:30 for first degree murder. By assignment number eight, the defendant contests the jury's conclusion that he had the requisite intent. He urges that the jury's disbelief of his testimony, alone, was insufficient to carry the state's burden of proof. Stroik v. Ponseti, 96-2897 (La.9/9/97), 699 So.2d 1072, 1080.
When an issue as to the sufficiency of the evidence is raised on appeal along with other trial errors, the reviewing court first determines the sufficiency of the evidence issue. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2 Cir. 4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2 Cir. 8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La. 10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La. 11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
La. R.S. 14:10 provides, in part:
Criminal intent may be specific or general:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively *1120 desired the prescribed criminal consequences to follow his act or failure to act.
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Wilhite, 40,539 (La. App. 2 Cir. 12/30/05), 917 So.2d 1252. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act. State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2 Cir.1993).
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975); State v. Dean, 528 So.2d 679 (La.App. 2 Cir.1988). In reviewing the correctness of such a determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, supra; State v. Huizar, supra.
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Brooks, 36,855 (La.App. 2 Cir. 3/05/03), 839 So.2d 1075, writ denied, XXXX-XXXX (La.11/07/03), 857 So.2d 517; State v. Dooley, 38,763 (La.App. 2 Cir. 9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30.
La. R.S. 15:449 provides:
The term "admission" is applied to those matters of fact which do not involve criminal intent; the term "confession" is applied only to an admission of guilt, not to an acknowledgment of facts merely tending to establish guilt.
In State v. Jones, 451 So.2d 35 (La.App. 2 Cir.1984), writ denied 456 So.2d 171 (La.1984), this court explained the distinction between admissions and confessions:
There is a broad distinction between the mere admission of inculpatory facts and a confession of guilt. Where a person only admits certain facts from which the jury may or may not infer guilt, there is no confession. An admission is circumstantial evidence for it is merely an acknowledgment of facts from which an inference of guilt can be drawn. A confession is direct evidence for it is an acknowledgment of guilt for which no inference need be drawn. McCormick on Evidence, § 185 (2d Ed.1972); Wigmore, Law of Evidence, § 25 (3rd Ed.1940).
Much of Wilson's statement to investigators constituted a confession to the crimes of aggravated kidnapping, armed robbery and aggravated rape, but he denied to the investigators, and at trial, that he had the intent to kill Ms. McGraw, so his statements to investigators showing that he fired the fatal shot are merely admissions.
When a witness, other than the defendant, is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt. State v. Cousin, 1996-2973 (La.4/14/98), 710 So.2d 1065 (collecting cases); La. C.E. art. 607 D(2). Because the defendant's statement to investigators *1121 admitting that he fired the shot was his own statement, and not that of another witness, it was admissible as substantive evidence of his guilt, but because the statement was not a confession that he intended to kill Ms. McGraw, it constitutes an admission and so is circumstantial evidence.
The jury heard from the defendant that there were only three occupants of Ms. McGraw's vehicle during these events the victim, the defendant, and Derrick Bouya. The jury was faced with the decision of whether the defendant, or Bouya, fired the shot that killed Ms. McGraw. Bouya did not testify at the guilt phase of this trial, so the defendant was the only witness present with firsthand knowledge of the murder, and he testified that Bouya, still sitting in the SUV, fired the fatal shot out of the open door of the vehicle.
The defendant's testimony differed sharply from his statement to police, giving the jury a justifiable reason to discredit his testimony. Wilson claimed that he lied to police in order to avoid retaliation from Bouya, but had no explanation why he told police that Bouya prompted him to shoot Ms. McGraw thereby trying to place the blame back on Bouya. In fact, the jury heard Wilson testify at trial that during the kidnapping, "[Bouya] didn't listen the first time, so with the barrel of the [MAK-90] I was poking him in his side so we can getso I got his attention."
The jury heard evidence that is sufficient to show that Wilson was, in fact, the shooter. In his statements to investigators and his testimony at trial, Wilson consistently admitted that he was outside the cabin of the SUV when the shot was fired. Moreover, the coroner's testimony indicated that the wound was consistent with the victim having her head down, assuming that the shooter was in front of her. The coroner described the angle of the shot to the jury, and the jury had the benefit of large photos of the scene, of Ms. McGraw's two-door vehicle, and the position of her body. In addition, the jury saw the autopsy photo of Ms. McGraw's head and the location of the bullet wound. The fatal shot was delivered directly into the center of Ms. McGraw's head. After hearing Wilson's testimony, his prior inconsistent statement, and reviewing the physical evidence, the jury was convinced that Wilson had the requisite intent. Wilson admitted that he, not Bouya, was standing outside the SUV when the shot was fired, and the jury could reasonably have concluded based on all of the evidence that only a person outside the vehicle could have fired the fatal shot.
Because the evidence was sufficient to convince a rational trier of fact beyond a reasonable doubt that the defendant had the specific intent to kill or inflict great bodily harm upon the victim, this assignment of error is without merit.
Batson Challenges
By his second assignment of error, the defendant contends that the trial court correctly found that the prosecutor was striking African-American women on the basis of their race, but erroneously failed to provide a remedy for this equal protection violation. We conclude, after a complete review of the Batson hearing and the voir dire record, that the trial court did not err in denying defense counsel's Batson challenge. We further conclude that the finding of the trial court in its written opinion that the prosecutor's explanations for exercising peremptory strikes were not plausible and not race-neutral, and therefore pretextual, is clearly erroneous. Accordingly, this assignment is without merit.
After voir dire of 8 death penalty-qualified panels and 4 general panels, the court assembled the remaining qualified *1122 prospective jurors in another courtroom and began selection of 12 jurors and 2 alternates. The 36 members of the qualified venire consisted of 12 white males, 12 white females, 11 African-American females.[3] The court submitted the names of the prospective jurors in groups by rounds, allowing each side to exercise its peremptory challenges[4] each round. Eventually a jury was selected that consisted of only three females, two of whom were African-American and one white female. Before the alternates were selected, defense counsel, who had used peremptory strikes to excuse 9 of the 12 prospective white females and one of the three African-American females who were not challenged by the state, raised a Batson challenge asserting that the state had systematically struck African-Americans from the panel. The court determined that the state had struck 8 of the 11 African-American female prospective jurors and immediately required a response to the charge from the state without first ruling that the defense had made out a prima facie case of racial discrimination in jury selection. The prosecutor stated her race-neutral reasons for the eight strikes and made a reverse Batson objection against defense counsel, alleging that he struck prospective jurors on the basis of both gender and race.[5] The general strategy of the prosecutor was to excuse those jurors whom the prosecutor believed would be less inclined to impose a death sentence, while the strategy of the defense was to excuse those jurors whom it believed might be inclined to impose a death sentence.[6]
The court subsequently required the state to restate its reasons with respect to four jurors and then took the matter under advisement. Alternate jurors were selected, both of whom were females, but whose race was not stated. In consideration of the pending Batson issue, the court sequestered six of the prospective jurors who had been struck by peremptory challenges and instructed the attorneys that they should be prepared for trial the following day.
The following morning, the trial court denied both Batson challenges, ultimately concluding that, "based upon Louisiana case law, the exclusion of certain jurors by peremptory challenges in this particular case does not raise [sic] to a level to constitute a violation." However, before reaching this conclusion, the trial judge remarked on the ruling indicating some ambivalence:
Dismissing from a jury a person who has successfully completed voir dire examination without a challenge for cause primarily because of the person's race or gender is wrong. It violates the constitutional equal protection rights of the defendant and the person called for jury duty. In addition the Court believes that the defendant as well as the victim deserves a jury that looks like them whenever possible. I will momentarily file into the Court record my written decision which shall include a statement that the Court believes counsel for the *1123 State and the defendant have given [inaudible] reasons for systematically excluding certain black females and white females from this jury.
However . . . I'm a realist. I've read the case law, and with exception, Mr. Glassell, of State v. Harris which you provided the Court, the State Supreme Court decision from June of this summer, I believe that consistent with the significant case law of this state, this trial court is denying both Batson motions. And, I'm deferring to the appellate court to affirm this Court's position that based upon Louisiana case law, the exclusion of certain jurors by peremptory challenges in this particular case does not raise [sic] to a level to constitute a violation. If I thought that the case law would agree with me, I would have granted both motions.
While the language in his oral ruling indicated an ambivalence toward his ruling denying the Batson challenge, the court's written decision contained statements characterized as factual findings that are inconsistent with the court's ultimate ruling denying the Batson challenges. The court wrote:
[C]onsidering the explanations asserted by the State and Defendant for using their peremptory challenges, this Court readily concludes that, as to [jurors] Y.M., B.M. [struck by the state], S.G. and S.D. [struck by the defendant], said explanations are not persuasive and/or plausible. This court believes that the State was reluctant to have a jury composed of African-American females and the Defendant was fearful to have a jury composed of white females.
And further:
After having inquired and weighed the allegations presented in the pending Motions, this Trial Court Judge finds that the State and Defendant have dismissed certain jurors for reasons which are not race and/or gender neutral. Perhaps absent malice yet with an awareness of the existence of the Batson principles, Counsel for the Defendant and the State have camouflaged their desires and intent to select a jury most favorable to their objectives among expressed reason(s) and arguments of neutrality which appear to be merely "pretextual." In view of the race and gender of the Defendant (African-American male) and victim (white female), this Trial Court Judge detects and senses a racial and gender bias in dismissing certain prospective jurors by using peremptory challenges. This court believes that a Defendant, as well as a victim, deserve a jury that looks like them whenever possible and it was possible in this particular case. [Emphasis added.[7]] Each person summoned as a prospective juror is also entitled to be included regardless of race or gender."
Nevertheless, the trial court ultimately denied the Batson challenges stating:
However, not withstanding its findings, this Court shall deny both oral motions subject of this Opinion because this Court does not believe that the "pretextual" explanations given by the Defendant and State, especially the State [emphasis added[8]], are significantly faulty under Louisiana case law standards to constitute a violation. Consequently, this Court shall empanel the selected jurors, proceed with this trial, and defer the merits of said Motions to the Appellate Court.
The defendant objected to the court's ruling, and in particular objected to the *1124 exclusion of jurors Yvonne Mitchell (identified by her initials "Y.M." in the court's reasons) and Beatrice Maxile ("B.M." in the court's reasons). On appeal, the defendant argues that the trial court erred in failing to re-empanel Ms. Mitchell and Ms. Maxile after finding that the state had struck these jurors because of their race.
Appellant argues that the court's ruling is nonsensical because the court determined that the prosecutor's reasons for removing Ms. Mitchell and Ms. Maxile were pretexts intended to "camouflage [her] desire and intent to select a jury most favorable to [her] objectives," but then concluded that the explanations were not significantly faulty under Louisiana case law to constitute a violation. The state struck Ms. Mitchell and Ms. Maxile because it believed that Ms. Mitchell, as a minister's wife, and Ms. Maxile, as a volunteer teacher at Hamilton Terrace, a school for "at risk" teens[9] that the defendant had attended, might be less inclined to impose a death sentence.
Appellant contends that the voir dire record of both Ms. Mitchell and Ms. Maxile does not support the state's reasons for the strikes. He argues that both women indicated during voir dire that they were not opposed to or reluctant with regard to the death penalty, and both women had very stable, long-term employment. In short, the record of voir dire indicated that these two women harbored no bias and were well qualified to serve. Hence, he argues that the trial court's conclusions that the state's proffered reasons for the peremptory strikes of these two women were pretextual is supported by the record and not clearly wrong.
The state contends that its reasons for striking Ms. Mitchell and Ms. Maxile were race-neutral and supported by the record. It struck Yvonne Mitchell because she was married to a minister and active in the church. It also struck Mr. Valentine, a white minister, for a related reason after he expressed views regarding a duty to consider "forgiveness." The prosecutor believed that Ms. Mitchell might feel some pressure from her husband and the church congregation to not impose a death sentence. Although this particular issue was not explored during voir dire, the prosecutor noted that she failed to give her husband's name on a jury questionnaire and it was only later discovered that she was married to a minister.
Regarding Ms. Maxile, the state contends that because she is a volunteer at a school for difficult kids, it feared that she might be overly sympathetic to the defendant who attended the school although she did not know him. Additionally, the state noted that while Ms. Maxile said she was not opposed to the death penalty in cases of heinous murders, she could not personally vote for it.
Law
The Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. Louisiana has codified the ruling in Batson in La.Code Crim. Proc. Ann. art. 795(C).[10] If the defendant makes a prima *1125 facie showing of discriminatory strikes, the burden shifts to the state to offer race-neutral explanations for the challenged members. The neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar. State v. Collier, 553 So.2d 815, 820 (La.1989). If a race-neutral explanation is tendered, the trial court must decide, in the third step of the Batson analysis, whether the defendant has proven purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991); Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724; State v. Elie, XXXX-XXXX (La.07/10/06), 936 So.2d 791. A single strike based upon race supports a Batson claim and requires reversal no matter how ably the state has defended the other strikes. Id; Batson, 476 U.S. at 95, 106 S.Ct. at 1722.
The Batson explanation does not need to be persuasive, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. Purkett, 514 U.S. at 767, 115 S.Ct. at 1771. The Hernandez court explained:
In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." (Citation omitted). "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part "because of" and not merely "in spite of" its adverse effects upon an identifiable group. (Citation omitted).
A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the *1126 prosecutor's explanation. Unless a discriminatory intent is inherent in the [party's] explanation, the reason offered will be deemed race-neutral.
Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866.
Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, the trial court then has a duty to determine if the defendant has established purposeful discrimination. The ultimate burden of persuasion remains on the party raising the challenge to prove purposeful discrimination. Purkett, 514 U.S. at 767-68, 115 S.Ct. at 1771; Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866. Hence, the final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, supra, at 768, 115 S.Ct. 1769; State v. Elie, supra. The Hernandez court further elaborated:
An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the classification bears more heavily on one race than another. If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination.
In light of these precepts, we now review the trial court's findings of fact and Batson ruling.
Analysis
After defense counsel stated his Batson objection, the trial court did not rule on whether defense counsel had made out a prima facie case of racial discrimination nor did the prosecutor ask for such a ruling before responding to the Batson challenge by offering her race-neutral reasons for the peremptory strikes.[11] Although the party alleging discriminatory use of peremptory strikes bears the burden of establishing a prima facie case of discrimination, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez, supra at 359, 111 S.Ct. at 1866. We note, however, that defense counsel supported his Batson objection only by pointing out a pattern of strikes against black jurors included in the particular venire. Such a pattern might give rise to an inference of discriminatory intent for purposes of making out a prima facie case. State v. Duncan, 1999-2615 (La.10/16/01), 802 So.2d 533.
The second step in the Batson analysis is to determine if the state met its burden of offering race-neutral reasons for exercising its peremptory strikes. A race-neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the sole issue is the facial validity of the prosecutor's explanation, not whether the explanation is plausible. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be *1127 deemed race-neutral. Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866.
In this case, as the prosecutor gave a race-neutral reason for each strike of an African-American juror, the trial court gave defense counsel an opportunity to rebut the proffered explanations. We now briefly summarize these reasons and defense counsel's response:
Ms. Theus
The prosecutor gave two race-neutral reasons for challenging Ms. Theus. First, Ms. Theus herself stated that she would not be a good juror because she would be worried about her handicapped sister. The court stated that it agreed, stating that it had doubts about Ms. Theus. Additionally, the prosecutor stated that Ms. Theus indicated during voir dire that she would need proof greater than "beyond a reasonable doubt" to impose a death sentence. The state also noted that it had struck the white female juror, Ms. Dixon, for the same reason.
The defense offered no response to the state's reasons when asked by the court and subsequently conceded that the state's reasons for striking Ms. Theus were race-neutral.
Ms. Simpson
The prosecutor had previously challenged Ms. Simpson for cause because she stated that she would have a difficult time sentencing a person to death and finding a person guilty. She also stated that she would have difficulty passing judgment on a person because she did not want anyone passing judgment on her own sons. She also said she would vote for a lesser crime to makes things easier on herself.
The defense told the court it had no response to this challenge and subsequently conceded that the state's reasons for striking Ms. Simpson were race-neutral.
Ms. Lewis
The state said it struck Ms. Lewis because it was difficult to get responses from her other than "yes" or "no" answers, and she had expressed bitterness toward the police over how she was treated when her son was shot. She apparently had been brushed aside by police at the scene of the incident and not allowed to go to her son. The prosecutor expressed her concern that because there was going to be testimony from a Shreveport policeman in addition to members of the sheriff's office, she was concerned that Ms. Lewis harbored resentment toward the police, and she might not be a good juror to determine the credibility of a police officer's testimony.
Again, the defense told the court it had no response to the state's reasons for challenging Ms. Lewis.
Ms. Scott
The prosecutor was concerned with Ms. Scott because she had only recently changed her opinion on the death penalty, having previously been a death penalty opponent. She said that she changed her mind because her brother was recently killed. The prosecutor expressed her concern that Ms. Scott might not feel favorable toward the death penalty in cases where the victim was not known to her. Additionally, Ms. Scott had a son who got into trouble when he was 17, the same age as the defendant, and she expressed her belief that he would not have gotten into trouble but for the people with whom he was associating. The prosecutor was concerned that Ms. Scott's beliefs regarding her son might influence her decision regarding the defendant's responsibility inasmuch as his defense consisted of similar excusing conditions concerning age, peer pressure or undue influence and intoxication.
The defense told the court that it had no response to the state's proffered reasons *1128 for challenging Ms. Scott and conceded that the state's reasons for striking Ms. Scott were race-neutral.
Ms. Bogan
The state offered reasons for striking Ms. Bogan similar to those concerning Ms. Scott. Ms. Bogan was the mother of a 19-year-old son who she said was hanging around the wrong crowd. He had gotten into trouble and had served time in jail. The state simply believed that the case was "too close to home" for Ms. Bogan.
The defense responded that it did not believe the prosecutor had stated a race-neutral reason, arguing that taken as a whole, Ms. Bogan's answers indicate she would be a good, fair juror in this case.
Ms. Mitchell
The state indicated that it was [not][12] very concerned with Ms. Mitchell until she indicated that she was married to Reverend Mitchell, a minister of the New Elizabeth Baptist Church. Noting that it had struck a white male prospective juror, Mr. Valentine, who was a minister, for the same reason, the prosecutor was concerned that someone very close to a religious leader would have a difficult time voting for the death penalty under circumstances in which she must face her church and her husband and tell them she had done so.
The defense argued that there was nothing in Ms. Mitchell's responses to questioning that could give the prosecution any reason to strike her. It contended that it should make no difference that she was married to a minister of a black church for four or five months, and therefore, it is not a race-neutral reason. The defense also contended that the issue of her going back to the members of her church was not explored by questioning at voir dire. The defense also stated that Ms. Mitchell had worked for the telephone company for 29 years and had taken a "middle-of-the-road" approach toward the death penalty and mitigating circumstances.
Ms. Maxile
The prosecutor struck Ms. Maxile on grounds that she taught at Hamilton Terrace Learning Center, and even though she did not know the defendant, she would be familiar with the reasons why a student is at Hamilton Terrace and would be perhaps overly sympathetic. The prosecutor noted that anyone who worked at Hamilton Terrace on a voluntary basis such as Ms. Maxile must have a great deal of love for the children because "it is not an easy way to teach." She was concerned that because of her desire to help problem students she might not be able to vote for the death penalty. The prosecutor also stated that Ms. Maxile said she could only give the death penalty in extreme circumstances.
The defense argued that Ms. Maxile had previously taught for 31 years at Fair Park High School, that she was a stable member of the community, and for those reasons, the state had not met its burden of showing a race-neutral reason for excusing her.
Ms. Fuller
The last African-American female struck by the prosecutor was Ms. Fuller. The prosecutor observed that Ms. Fuller said that she could not have any doubt before voting for the death penalty and was tentative regarding whether she would actually vote for it. More importantly, she stated that she does not believe in plea bargains-that is, that a person should tell the truth without a plea bargain. Regarding a witness testifying pursuant to a plea *1129 bargain, Ms. Fuller said she would assume that a person would tell on another person to get something lighter. The prosecutor was concerned because a plea agreement was reached with one of the codefendants in this case who might be called to testify, and Ms. Fuller might be reluctant to give his testimony any credibility. Ms. Fuller also said she did not want to make a decision about the death penalty. Finally, the state was concerned that although she was called for jury duty the previous December, she forgot about it. In the instant case, she also had to be contacted by the court's office to come in.
The defense responded by simply stating that it did not believe the reasons for dismissing Ms. Fuller were race-neutral. At this time, it conceded that the prosecutor had stated race-neutral reasons for striking Ms. Theus, Ms. Simpson, Ms. Lewis, and Ms. Scott, but contended that its Batson challenge was still good for Ms. Mitchell, Ms. Maxile, Ms. Fuller, and potentially Ms. Bogan.
Although the trial court did not expressly rule on whether the state's reasons for its strikes were facially race-neutral, we conclude that those reasons were facially race-neutral. The court essentially held a contradictory hearing by allowing each side to offer its reasons and argument in support of their respective positions. After holding a similar hearing on the reverse-Batson challenge by the state, the trial court identified four jurors that were subject to the defense's Batson challenge, including Ms. Lewis,[13] Ms. Mitchell, Ms. Maxile, and Ms. Fuller, apparently for purposes of hearing more argument. The court asked defense counsel if he wanted to present any argument since it had raised the Batson challenge. The defense elected not to argue its case at that time. Instead, defense counsel stated that he would defer to the state to make its argument, and then respond to the state's argument.
Ms. Lewis
The state articulated again its reasons for striking Ms. Lewis, namely, that Ms. Lewis indicated by her tone and terse answers that she did not want to serve on the jury. When she did speak, she conveyed her bitterness toward police regarding an incident in which her son had been shot, and that she was not allowed by the police to go to him. The prosecutor was concerned because her bitterness toward police might affect her evaluation of expected police testimony. Also, the prosecutor indicated that Ms. Lewis's son was charged with a crime pending in the court for which she is the prosecutor.
The defense responded that it did not believe Ms. Lewis knew that the current prosecutor would be prosecuting her son. Regarding her bitterness toward police, the defense argued that it was simply good police work and he did not think that this was a valid race-neutral reason. It noted that Ms. Lewis had been employed for 18 years and stated that she would vote for the death penalty and consider mitigating circumstances.
We note that the court stated that it was comfortable with the state's reasons and it did not give much weight to the challenge as to Ms. Lewis.
Ms. Mitchell
With respect to Ms. Mitchell, the state re-articulated its reason for the peremptory strike in greater detail, which is the belief that because she was the spouse of a minister, she would feel some pressure *1130 not to vote for the death penalty. The prosecutor noted that Mr. Valentine, whom it had struck because he was a minister, had stated that a minister has a responsibility to consider and encourage forgiveness, and she believed that a spouse of a minister such as Ms. Mitchell would be inclined also to this view. The state conceded that this was not explored on voir dire, but this was because it did not find out that Ms. Mitchell was married to a minister until it was mentioned during general voir dire to the defense counsel. She had apparently not included this information in answer to a questionnaire, although, contrary to the defense's argument, she had been married to the minister two or three months when she filled out the questionnaire.
The defense's argument on Ms. Mitchell was that she was a stable member of the community, having worked 29 years for the telephone company, and that she was "middle-of-the-road" on the death penalty.
Ms. Maxile
With respect to Ms. Maxile, a retired teacher now voluntarily teaching at Hamilton Terrace Learning Center, the state noted that its concern with Ms. Maxile was that she might feel some sympathy for the defendant because he was a Hamilton Terrace student. The prosecutor believed that because Ms. Maxile was voluntarily teaching at a school for problem youths, she must have a lot of sympathy for them, and accordingly, it would be difficult for her to vote for the death penalty. Additionally, the prosecutor noted that it had struck the white female prospective juror, Ms. Guerra, for the same reason. She was a school guidance counselor and the prosecutor felt that she might be overly sympathetic, particularly since she stated that she would have difficulty voting for the death penalty.
Counsel argued that Ms. Maxile had been in stable employment as a teacher for 31 years and that she did not personally know the defendant.
Ms. Fuller
The prosecutor reiterated that it had many reasons for striking Ms. Fuller, including her view that there could be not any doubt before she could impose the death penalty, she was tentative about the death penalty, not wanting to make that decision, her distrust of witnesses who enter plea agreements, her bad attitude and her poor attendance when called to jury duty.
The defendant responded that it did not think the prosecutor's reasons were race-neutral reasons.
We have no difficulty in concluding that the reasons offered by the state are facially race-neutral. A neutral explanation in this context is simply an explanation based on something other than race. Hernandez, supra at 360, 111 S.Ct. at 1867. None of the reasons offered by the state are inherently based on race. We observe, however, that defense counsel did argue that the reason offered by the state for striking Ms. Mitchell, i.e., her marriage to a preacher, was not racially neutral because the church, New Elizabeth Baptist Church, is an African-American church. We conclude, however, that neither this explanation nor the other explanations, taken on their face, exhibit an inherent intent to strike African-American jurors on the basis of their race.[14]
The final step of the Batson analysis requires the trial court to determine *1131 whether the defendant carried its burden of showing that the race-neutral explanations offered by the state were merely pretextual, that is, that they masked a true intent by the prosecutor to strike African-American jurors on the basis of their race. Aside from showing the numerical data that the state peremptorily struck 8 of the 11 African-American females to show an alleged pattern of striking African-Americans, counsel for the defense presented its strongest objections and arguments against the reasons offered by the prosecutor for striking Ms. Mitchell and Ms. Maxile. Counsel noted that Ms. Mitchell's marriage to a minister was not explored in voir dire, and the alleged effect of that on her vis-à-vis the death penalty were not supported by the record. Additionally, the voir dire indicated that both Ms. Mitchell and Ms. Maxile were "middle-of-the-road" on the death penalty. Counsel contends that the voir dire shows that each of them would make good jurors based upon their long record as productive citizens in the community. Accordingly, defense counsel contends that the state's reason for peremptorily striking Ms. Mitchell and Ms. Maxile, that is, that they might be more inclined to vote against the death penalty, is pretextual.
With respect to the actual Batson hearing, if not also in the court's Batson analysis, the trial court combined steps 2 and 3. Although Batson and its progeny provide a three-step method of analysis for the trial court to properly allocate the burden of production and burden of persuasion in order to determine the merits of the objection, it is not at all clear that the three-step analysis also dictates the procedure of a Batson hearing, inasmuch as the jury selection process may vary from state to state and court to court. We are concerned, however, that the Batson hearing in this case essentially allowed the defense to shift its burden of persuasion to the state.
From the outset of the Batson hearing, the trial court tended to place the burden of production and burden of persuasion on the prosecutor in this case to defend against the defense's Batson claim. Although the party making the Batson challenge has the initial burden of production to establish a prima facie case, the burden of production shifts to the other side to provide its reasons for exercising its peremptory challenges. The burden of persuasion, however, never shifts, but remains with the party raising the challenge. If the reasons supplied in step two are not inherently racial or gender-based, then the court must determine if the party raising the challenge, who has the burden of persuasion, has carried its burden by showing that the facially race or gender-neutral reasons are merely a pretext to exclude jurors on racial or gender basis. Yet in this case, the trial court essentially called the prosecutor back to defend its reasons for striking four jurors, including Ms. Mitchell and Ms. Maxile, effectively transferring the burden of persuasion to the prosecutor to show that her intent was not racially motivated.
Adding to our difficulty in sorting this case out, the trial court, albeit understandably, rendered an opinion in which it combined much of its analysis and conclusions regarding the defendant's Batson challenge against the state with the state's reverse-Batson objection against the defense, making it difficult to ascertain exactly what grounds or reasons, other than bare statistics, provide the basis of the court's finding that the prosecutor's reasons were pretextual. We do agree with the trial court, however, that the final jury consisting of only two African-American females and one white female is without *1132 doubt the result of the combined effects of both sides' peremptory challenges.[15]
In his ruling, the trial court stated that the "State's pattern of using peremptory challenges against African-American females was obviously greater than against other prospective jurors." As a result of this (and the defendant's challenges against white females), the court said that it "became suspicious that the State's and the Defendant's patterns of exercising peremptory challenges were based on race and gender respectively." The court said it was "particularly disturbed with the State's explanation" for striking Ms. Mitchell and Ms. Maxile. The court then criticized both sides because the composition of the tentative jury selected was absent a significant number of African-American females and white females. The court ultimately concluded, without pointing to any specific evidence or reasons, that the reasons given by the state for striking Ms. Mitchell and Ms. Maxile were not plausible. It simply concluded that the reasons were not race-neutral and were therefore pretextual. Ultimately, however, the court concluded that the "reasons were not sufficiently faulty" under the case law to rise to an equal protection violation.
Appellant contends that once the court made a finding that the reasons offered striking Ms. Mitchell and Ms. Maxie were pretextual, the court was required as a matter of law to uphold the Batson challenge and seat those jurors, and its failure to do so constituted reversible error.
La. C.Cr.P. art. 795(E) states that the court may seat the juror or "may take such other corrective action as it deems appropriate under the circumstances," when it finds that the reasons for the strike were not race-neutral. This implies that the court is not necessarily required to seat the juror, but may take other corrective action. However, we do not find it necessary to decide that issue in this case because, based on our review, we conclude that the trial court clearly erred in finding that the reasons given by the prosecutor for striking Ms. Mitchell and Ms. Maxie were pretextual.
Although we are mindful of the great deference owed by an appellate court to the trial court's findings of fact, this record leads us to the conclusion that the trial court, largely due to the manner in which it held the hearing and allocated the burden of persuasion, confounded the racially disproportionate effect of the prosecutor's race-neutral reasons for the strikes with an invidious intent to discriminate on the basis of race. The record demonstrates, however, that the prosecutor struck those jurors whom it believed would be less inclined to impose the death penalty. It supported its beliefs as to each juror based on both voir dire and other reasons that were facially race-neutral, including the common sense concerns of the circumstances of Ms. Mitchell's marriage to a minister and Ms. Maxile's relationship with the school for troubled youths in which the appellant had attended. The end result of the prosecutor's jury selection strategy was to excuse perhaps one more African-American juror than one might expect through an entirely random selection process.
We also observe that, statistically, the 11 African-American females made up slightly less than one-third of the jury pool in this case. Therefore, one would expect that nearly one-third of the jurors selected, *1133 that is, three or four jurors, would be African-American females. In this case, there were only two African-American females who served on the jury; however, the state, in fact, accepted three African-Americans to serve, and, importantly, it did not use all of its peremptory challenges. After these three African-Americans were selected, defense counsel exercised a strike-back against Ms. McCray, an African-American, apparently because of her favorable views toward the death penalty. Although the mere presence of some African-Americans on the jury is no bar to finding a prima facie case of racial discrimination, "it is appropriate to consider the fact that the state did not eliminate all African-Americans . . . and especially appropriate when, as in this case, a unanimous verdict is required and the prosecutor has unused peremptory challenges." State v. Duncan, supra at 549 and n. 17.
We find nothing in the state's questioning during voir dire that indicates any intent to discriminate by the state. The state gave specific, facially non-racial reasons for exercising its peremptory challenges according to each individual juror supported to varying degrees by the voir dire, and every race-neutral explanation with exception of Ms. Theus and perhaps Ms. Lewis, demonstrated that the prosecutor's intent or purpose for the strikes was to exclude those jurors that it believed might hurt its prosecution of the death-penalty case in the sense of being less inclined to vote for a death sentence. In other words, the state was attempting to obtain a jury that it believed would hold the most favorable view or inclination toward imposing a death sentence. At the same time, and equally clear from the record, defense counsel was fighting hard to seat a jury that was less inclined to impose a death sentence.
The effect of the prosecutor's race-neutral basis for the peremptory strikes was to eliminate a slightly disproportionate number of African-Americans from the jury.[16] However, "no matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race." Hernandez, supra at 374, 111 S.Ct. at 1874; see also, Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).
The ultimate question in this case is whether the trial court's finding that the prosecutor's reasons for striking Ms. Mitchell and Ms. Maxile were pretextual is clearly wrong. The reasons stated by the prosecutor, in both cases, were based on the prosecutor's view that these two women, because of their position in the community, might be less inclined to impose a death sentence in this capital case. Ms. Mitchell had recently married the minister of the New Elizabeth Baptist Church. Although this fact was not explored during voir dire, the transcript indicates that Ms. Mitchell did not indicate that she was married on the jury questionnaire and the matter became known to the state after it had questioned her. At any rate, the prosecutor's concern was that Ms. Mitchell would perhaps be put in an awkward position to vote for the death penalty because both her husband and her husband's congregation would know how she voted, since a capital verdict requires a unanimous jury. The state has cited numerous cases that have recognized that ministers and ministers' wives are natural targets of race-neutral peremptory challenges.
*1134 Likewise, although Ms. Maxile was death-penalty qualified, the state feared that her ties to the school in which she worked and where the defendant once attended, and the fact that she was a volunteer teacher might make her overly sympathetic to the defendant. The state also challenged a white female teacher, Ms. Guerra, although it did not challenge Mr. Reeves, a white male coach. The state contends that a coach is in a different position than a teacher of students who have special needs. Additionally, Mr. Reeves was a strong advocate of the death penalty. On their face, the reasons are race-neutral. We also do not find these explanations to be unreasonable or implausible.
Our review of the voir dire record and the race-neutral explanations given by the state for exercising its peremptory challenges against Ms. Mitchell and Ms. Maxile leads us to the conclusion that the trial court, notwithstanding its findings of race-based strikes, which we now determine are clearly erroneous, correctly concluded that there was no Equal Protection violation and correctly denied the defendant's Batson objection. Accordingly, this assignment is without merit.
By his third assignment of error, the defendant urges that the trial court erred in failing to find that the state's peremptory strikes of the other African-American women was an Equal Protection violation under Batson, supra. Specifically the defendant challenges the race-neutral reasons for striking jurors Audry Lewis, Margaret Scott and Dameshia Fuller. We note that the defendant's attorney stated during argument before the trial court that "[W]e would concede that [the state] has stated a race-neutral reason for Ms. . . . Lewis and Scott." He later stated that he had been focused primarily on "Lewis, Mitchell, Maxile and Fuller." At least with respect to Ms. Scott, and perhaps as to Ms. Lewis, the defendant seemingly abandoned his Batson challenge. We will nevertheless review the assignment of error.
From the start, Ms. Lewis was not a cooperative juror; she said "I don't much like it" in response to a question about what she thought about being in court. She gave relatively short answers to questions, although, to be fair, many jurors do the same thing. She also said that police had treated her like she was the criminal and "pushed me to the side like I didn't exist" when her son had been shot. This exchange is also illustrative:
Q: Will you weigh [police officers'] credibility just as you would any other witness, or are you going to wonder because of the way you were treated by the police?
A: I probably wonder, you know.
Q: Will you wonder if they're telling the truth?
A: I pretty much believe one incident that I didn't appreciate.
Q: What was that?
A: That pretty much respect the system, I believe in the system. It's just that one incident that I didn't appreciate.
Q: Okay. So, it just kind of left a bad feeling with you about the police because of the way?
A: They were putting him in the ambulance leaving, they wouldn't tell me nothing, wouldn't let me go with him, just put me to the other side of the street.
Q: Brushed aside and that was such a horrible situation. But other than that you don't have any problems with the police?
A: No.
*1135 The state said that it struck Ms. Lewis because of this exchange and because the case against the man who shot her son was pending before the prosecutor who was prosecuting Wilson. The court accepted the prosecutor's reasons as race-neutral and said, "this Court doesn't give a lot of weight to the challenge as to Ms. Lewis."
We conclude that the trial court was not manifestly erroneous. She clearly expressed some hostility toward the police, and that is certainly a race-neutral reason that the prosecutor would be concerned with, particularly when there are law enforcement witnesses scheduled to testify.
Ms. Margaret Scott works at LSU Medical Center in the supply department. During Witherspoon[17] questioning, she and the defendant's attorney had the following exchange:
Q: Have your attitudes and opinions about the death penalty changed over the years?
A: Yes, it has.
Q: How have they changed and why?
A: Well, at first I didn't believe in it, but my brother was killed, and I always felt that the person that did it really and truly didn't get what they deserved.
She felt that her brother's killer was treated too lightly by the justice system because he received only a short sentence for the crime. She gave basically acceptable answers to questions, saying that she would not automatically vote for the death penalty nor would she refuse to consider it, depending on the circumstances.
Also, Ms. Scott's son, then 18 years old, was housed at a youth correctional center for a variety of juvenile offenses. She said that she had "wonderful" experiences with the criminal justice system with regard to her son because it got him off the streets as she wanted. Her son had a drug and alcohol problem and that he had also been influenced by his friends, both of which were potential issues in the instant case. She said that she could be fair and impartial to the state.
The state cited Ms. Scott's drastically changed attitude toward the death penalty and the similarity between her son's age and circumstances and Wilson's age and circumstances as race-neutral factors. The defendant had no response or evidence of racial bias. Apparently the trial court accepted these reasons. There is a similarity between Ms. Scott's son's problems and the defendant's troubles with the law, although certainly Ms. Scott's son had done nothing like what Mr. Wilson had done. Nevertheless, the state articulated a valid concern that Ms. Scott might be sympathetic toward the defendant because of these similarities. We find no manifest error in the court's handling of this potential juror, although going from the record alone, a different trial judge could reasonably have concluded contrarily from the judge in this case.
Dameshia Fuller was challenged by the state because "she could not have any doubt before voting for the death penalty" and because she "doesn't believe in plea bargains." Ms. Fuller expressed reluctance to accept the testimony of a person who had received a lighter punishment in exchange for their testimony. She said, "I would think that they could have just told the truth from the beginning." The state planned to, and indeed did, present the testimony of Derrick Bouya at the penalty phase, and Bouya had been allowed to plead guilty to avoid the death penalty in exchange for his testimony. During Witherspoon questioning, she also said "I said if I believe that he actually did *1136 it, then I would vote for [the death penalty]. But I couldn't have any doubts that he didn't do it." The prosecutor then explained the reasonable doubt standard, and Ms. Fuller seemed to understand the explanation. She also expressed reservations that she could consider any mitigating factors except insanity. However, when asked if the decision to impose the death penalty was the most important decision she had ever had to make, she said, "It is, and it's one that I don't want to have to make."
The court's decision to accept the state's proffered reason as to Ms. Fuller was not manifestly erroneous. She was reluctant to accept the responsibility of imposing the death penalty and she also expressed serious reservations about considering the testimony of a person who had gotten a plea bargain, both of which were issues that were going to be placed before the jury.
Challenges for Cause
Accordingly, this assignment of error is without merit.
By his fourth assignment of error, the appellant alleges that the trial court erred in denying several defense cause challenges.
The defendant exercised all twelve of his peremptory challenges. La. C.Cr.P. art. 799. On appeal he complains that the trial court erred in rejecting his challenges for cause as to jurors Marjorie Fowle, Charles Williams and Elizabeth Smitherman.
Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant has exhausted his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Divers, 94-0756 (La.09/05/96), 681 So.2d 320, cert. denied, 520 U.S. 1182, 117 S.Ct. 1461, 137 L.Ed.2d 564 (1997); State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 534.
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Juniors, 2003-2425 (La.6/29/05), 915 So.2d 291, cert. denied, ___ U.S. ___, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). A trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. Such determinations will not be disturbed on review unless a review of the voir dire as a whole indicates an abuse of discretion. State v. George, 26,867 (La.App. 2 Cir. 4/5/95), 652 So.2d 1382, writ denied, 95-1151 (La.9/29/95), 660 So.2d 855.
In State v. Broaden, 1999-2124 (La.2/21/01), 780 So.2d 349, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001), the supreme court outlined the procedure for handling challenges for cause based on a juror's views on the death penalty:
The standard for excluding a potential juror from a capital case based on his opinions regarding capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." State v. Frost, 97-1771, pp. 3-4 (La.12/1/98), 727 So.2d 417, 423, quoting Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The "substantial impairment" standard applies both to those who would vote automatically against capital punishment, i.e., those excludable under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) as clarified by Witt, *1137 as well as those who would vote automatically for capital punishment under the factual circumstances of the particular case, i.e., reverse-Witherspoon excludable jurors. State v. Divers, 94-0756, p. 8 n. 5 (La.9/5/96), 681 So.2d 320, 324 n. 5, citing Morgan v. Illinois, 504 U.S. 719, 727-29, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).
Such jurors are "not impartial," and cannot "accept the law as given . . . by the court." La.Code Crim. Proc. art. 797(2), (4); State v. Maxie, 93-2158, p. 16 (La.4/10/95), 653 So.2d 526, 534-35.
The failure to disqualify a venireman unable to consider both life and death as penalties constitutes reversible error. Divers, 94-0756 at pp. 8-13, 681 So.2d at 324-27; Maxie, 93-2158 at p. 23, 653 So.2d at 537-38 (error not to disqualify juror who could listen to mitigating evidence but viewed death as the only appropriate penalty, "[o]nce the crime guilt is established."); State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1283-84 (error not to grant challenge for juror who would vote automatically for death if the accused were convicted of the double murders charged); State v. Ross, 623 So.2d 643 (La. 1993) (error to deny challenge for juror who felt that the "only penalty" upon conviction of first degree murder was death).
However, answers by potential jurors to questions about mitigating circumstances have been addressed by this court in cases involving the denial of reverse-Witherspoon challenges by the defense against jurors regarding their answers. In State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, this court approved a death penalty when two jurors, who initially stated that they could not consider the defendant's youth and lack of criminal history as mitigating circumstances, eventually agreed they could consider all factors presented in the penalty phase and could consider a life sentence. In State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, this court approved the denial of a cause challenge when a juror stated that he would consider mitigating evidence, but would require substantial evidence in mitigation in order to be inclined to recommend a life sentence. In State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651, this court upheld the denial of a cause challenge against a juror who believed that the death penalty for an intentional killing "ought to be the law," but agreed to abide by the judge's instructions and to consider both life and death sentences. In State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, this court held that cause challenges were properly denied under the "substantial impairment" standard for a juror who would "kind of lean" toward the death penalty, but would entertain a life sentence if the judge instructed him to do so, and for a juror who felt the death penalty was appropriate for the murder of a child, but would be open-minded and would consider all mitigating circumstances. In State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, this court refused to overturn the trial court's denial of a cause challenge to a juror who initially stated that he would not consider the statutory mitigating circumstance of intoxication, even if so instructed by the judge, but ultimately agreed he would consider it and give appropriate weight "depending on the case."
We are mindful also that trial judges are accorded wide discretion when ruling on cause challenges. A refusal to disqualify a venireman on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to *1138 decide the case fairly according to the law and evidence. Howard, 98-0064 at pp. 7-10, 751 So.2d at 795-97; Robertson, 630 So.2d at 1281.
A. Marjorie Fowle
Ms. Fowle was a probation and parole officer for the state and the overall tone of her Witherspoon answers was strongly pro-death penalty. The mere fact that she was a probation and parole officer did not prevent her from serving on the jury, provided that her answers on voir dire indicated that she can be a fair and impartial juror. See State v. Ballard, 1998-2198 (La.10/19/99), 747 So.2d 1077. From her answers, Ms. Fowle did not appear to be influenced significantly by her employment in her ability to perform as a juror. She said that she didn't think her job would prevent her from being a fair and impartial juror; she said, "I'm one of the fairest persons I know, and I'm modest, too." She was later questioned extensively about her employment. She explained that she could put aside her employment and consider only what she heard in the courtroom:
Oh, yeah, I can do that. I really like some of my clients. Some of them are pretty decent human beings. Some of them aren't, but some of them are.
She also said that she had a neighbor who had been raped seven or eight years ago and a friend who had been sexually assaulted and physically injured, but explained that these events would not affect her ability to be fair and impartial. She apparently had been wearing a probation and parole shirt to voir dire but promised not to wear the shirt if selected to be on the jury.
Ms. Fowle commenced her answers to the prosecutor's questions about the death penalty with the statement "I'm all for the death penalty." She continued:
A: It all depends on the circumstances of each case. But mostly I believe in the death penalty. I'm tired of housing and feeding people who are not going to be rehabilitated by their time behind bars. I say do away with them, if you prove that they did what you said.
Q: Okay, but you said that it would depend on the circumstances?
A: Yes.
Q: Would you want to hear all of the information from both sides? There's two sides to every story. Would you want to hear everything before you made that decision?
A: Yes, I would.
Q: How about these mitigating factors? Would you consider them?
A: I would consider all of them.
Upon questioning by the defense attorney, Ms. Fowle reiterated that she was for the death penalty, and had been for a long time; she also said that she believed that DNA evidence was a very useful tool and hoped that she would have that evidence to consider when making the life or death decision. She later said that she could consider all of the mitigating factors in making the death penalty decision. She was not particularly impressed with any of the mitigating factors; she thought the strongest was the case of a principal whose participation was relatively minor. She explained also that she would be interested in knowing about the defendant before deciding on the death penalty. She further explained her views about the death penalty and discussed her feelings after the murder of a friend. Among other things, when asked directly if she could consider a life sentence for Wilson if the state proved him guilty of kidnapping, robbery and rape before the murder, she said:
A: Well, honestly that would depend on how enraged I am when we reach that *1139 point. I mean, if it is just horrible, disgusting, without a fact he did it, I'm going to be more inclined to say, no, you know, let's get him off the face of the earth. That's my honest answer, you know.
Q: That's what we want.
A: If I am not, you know, worked up that wayI'm always interested in hearing somebody's story. I'm always interested in that.
Q: So I guess if you're on the jury, you'd have to wait and see as to what your level of, I guess, rage or outrage at the time that you have to make the initial decision on whether he's innocent or guilty after hearing all the evidence. Would that be fair to say?
A: That would be fair to say. You know, if somebody were to do me in right now, who would look after my daughter? I'm a single parent. I have a very small, close-knit family. If one of us gets wiped out, that's a terrible, horrible loss for the rest of us. And my family is very close.
She then described the unsolved murder of her friend, said that it had hardened her heart about the death penalty for homicide, but said that she didn't think this event would affect her ability to be impartial.
The defendant twice challenged Ms. Fowle for cause. The first challenge focused on several elements of Ms. Fowle's answers that the defendant found objectionable, including her exposure, albeit slight, to media coverage of the case and her employment as a probation and parole officer and potential pro-state bias. The court denied this challenge and afforded the defendant the opportunity to reurge it after the general voir dire. After general voir dire, the defendant renewed his challenge under the reasons given before and added that Ms. Fowle had friends who had been the victim of sex crimes. The court denied the challenge, stating that "I don't think I've heard anything else to persuade this Court to depart from the Court's ruling and directions."
The court's decision to accept Ms. Fowle as a juror was not an abuse of the trial court's discretion. Clearly this juror was in favor of the death penalty, but she readily admitted her willingness to consider mitigating factors as explained by the court. She explained that she could consider a life sentence and would not automatically vote to impose the death penalty. Likewise, her answers regarding her employment and her friendship with crime victims did not disqualify her. She repeatedly said that she could be fair and impartial as a juror and listen to the evidence. Nothing in this record shows that the trial court erred in denying the challenges to Ms. Fowle.
B. Charles Williams.
Charles Williams was actually seated as a juror. When questioned about mitigating circumstances in connection with the death penalty, he agreed that he could consider no significant criminal history and intoxication as mitigating factors but rejected the influence or domination of another unless "it was some extreme case of being under someone's domination." He said that "peer pressure" wouldn't matter unless "if it was possibly a situation where someone was borderline brainwashed or something like that, or maybe someone had, was a matter of, you know, they did it or they were going to die themselves, something like that, if they were in fear for their life." He later said that "it would be hard to" consider mitigating circumstances where the state proved that the defendant was engaged in a kidnapping, robbery and rape.
*1140 Mr. Williams said "no, I don't think so, no" when asked if he would be willing to consider youth as a mitigating factor when the defendant was 17. Upon further questioning, he agreed that he could consider all of the mitigating factors provided by law. He also gave additional explanation to his answers about mitigating factors:
Q: I believe you told me earlier that you wouldn't consider youth as a mitigating circumstance, if somebody was seventeen?
A: Well, I think seventeen is old enough to know right from wrong when it comes to something that serious.
Q: And now you're basically, you're saying that you would not consider under the influence of [sic] dominion of another person as a mitigating circumstance, if it's just going along with some older guys?
A: No.
The defendant challenged Mr. Williams for cause on the basis that he could not accept youth as a mitigating factor. The judge essentially concluded that Mr. Williams never flatly said that he could not consider youth as a mitigating factor but that the juror did not consider a 17-year-old to fall within the factor. Mr. Williams did not have a problem following the law, he simply thought that a 17-year-old was old enough to know right from wrong; in other words, that a 17-year-old was not young enough to get the benefit of this mitigating factor because he should know better and be able to conform his conduct to the law. The trial judge did not err in denying this challenge for cause.
C. Elizabeth Smitherman.
Smitherman was a young woman who worked in a veterinarian's office. She generally indicated that she could consider the mitigating circumstances but seemed to have low regard for many of the enumerated factors. The answer that the defendant found most objectionable was Ms. Smitherman's response when asked whether anything had affected her view of the death penalty during her life:
I haven'tI mean, I guess I was raised that there's going to be consequences if you don't do what you're supposed to, but I've also worked for a vet for a long time, and if we get a dog or a cat that's temperamental, you know, and the owner can't control it, then there's the option of them to euthanize the pet. And that to me kind of links the two together. If this person is not-if their behavior is not good for society, then we haveif they're going to kill people, then we have the option of the death penalty, you know, and I agree with that.
This response was elicited from a question designed in part to get the jurors to relate the death penalty to their own life experiences. The defendant raised this answer in his challenge for cause, but the court denied the challenge, concluding that the juror, while pro-death penalty, was worthy to serve. The court's conclusion was correct; the juror indicated every willingness to follow the law as given by the court and did not indicate that she would automatically vote for the death penalty.
This assignment of error is without merit.
By his fifth assignment of error, appellant contends that the death qualification of Mr. Wilson's jury denied him a fair and impartial jury under the state and federal constitutions.
Defendant argues that his jury was more inclined to convict him because of its very nature as a death-qualified jury. Citing several law review articles, defendant urges that death-qualified juries are more likely to be composed of white male Protestants *1141 who are more likely to vote to convict. The law as it stood at the time of this trial allowed the state to pursue the death penalty against Mr. Wilson. The jury that was actually empaneled in this case was composed of persons who all indicated, to the court's satisfaction, their ability to follow the law with respect to the guilt phase as well as the penalty phase. Regardless of whether there may or may not be a statistical trend showing death-qualified juries more likely to convict, there is absolutely no indication from the record in Mr. Wilson's case that the jury that was actually empaneled could not follow and apply the law as given by the court.
This assignment of error is without merit.
Motion for Mistrial
By his sixth assignment of error, appellant asserts that the trial court erred in failing to declare a mistrial when the state purposefully elicited testimony that Mr. Wilson's nickname was "Killa."
During the investigation of this crime, police interviewed numerous witnesses who were familiar to one degree or another with the defendant. Transcripts of these witnesses' statements are included in the record as part of the state's discovery response. As the CPSO worked to learn the identity of the perpetrators, witnesses were questioned about the "street" names or nicknames of the various suspects. Except for the defendant, several persons involved in this crime had a street name that was generally well known to the other witnesses or informants. The following information is what the various witnesses knew about the defendant's street name:

Witness Defendant's Street Name
Jerome Bagley "I don't know."
Kevin Dodson Did not know; "`Monster' may be
 Adrian" (his name for Aaron
 Wilson).
Torrius Scroggins After the crime, Wilson was bragging,
 he said "that he was (inaudible),"
 then the detective said "He
 [Wilson] was calling himself Killer?"
 In a later statement, he said that
 Wilson had no street name.
 In a discovery response filed on May
 2, 2001, the state provided a January
 10, 2001, CPSO report from Deputy
 Jason Morgan discussing the earlier
 interview with Scroggins. The
 report states "Scroggins advised
 that Aaron began bragging about
 the killing, telling everyone to call
 him
 `Killa.'"
Derrick Bouya Called the defendant Aaron. Did
 not seem to recognize the nickname
 "Black." During an interview, one of
 the CPSO investigators referred to
 "Killer." In a later statement, said
 that Wilson had no street name.
Leon Bagley, III Did not know.
Crystal Anderson Aaron.
Edward Bouya First responded that he did not
 know or the defendant did not have
 a street name. Then said that the
 defendant's street name was
 "Black," and said that after the
 crime, the defendant was trying to
 get others to call him a new name
 but did not remember.

Numerous other witnesses or informants were not asked about the defendant's street name. The defendant's attorney used the street names of the other participants in opening argument-and particularly used the name "Monster" with reference to Bouyabut mentioned nothing about a street name for the defendant.
During the trial, CPSO Investigator David Hensley testified that the only street name he ever heard for Wilson was "Black" and that he did not know of a "known" street name for Wilson. CPSO Investigator Jay Long testified next and engaged in this dialogue with the prosecutor:
Q: In the course of your investigation did you hear of any nicknames that Aaron Wilson had?
A: Yes.
Q: And what would those be?

*1142 A: Well, Killa is the way it was pronounced. Killer.
At that point the defendant objected, and there was an unrecorded bench conference. After the conference, the prosecutor finished with the witness, and defense counsel then questioned the witness in front of the jury about the nickname:
Q: Detective Hensley did not know that nickname. Did you tell Detective Hensley that nickname?
A: Detective Hensley had copies of the reports, yes.
Q: Well, he just testified a few minutes ago that he didn't know if Aaron Wilson had any nicknames. Maybe he had the nickname of Black but no other nicknames. Did you tell Detective Hensley that nickname when you learned it?
A: Yes, it's in the reports.
The defendant later argued the objection to the court, and the prosecutor noted that the nickname had been included in the January 2001 report that was provided to the defendant in May 2001. Apparently Scroggins was unavailable to testify because he had invoked his Fifth Amendment privilege, so the defendant objected to the nickname as hearsay. The defendant also asked for a mistrial based on the prejudicial nature of the nickname. After the court denied the motion for mistrial, the defendant asked for an admonishment to the jury to disregard the nickname. The court addressed the jury the next morning with the following:
The jury is admonished to disregard the testimony of Investigator Jay Long when he testified about an alleged nickname for the defendant.
The admonishment is very nearly identical (substituting "for" for "of") to the one the defendant asked the court to give. The defendant now argues that the trial court should have granted his motion for mistrial.
The state's use of a nickname or street name for a defendant arises most often in cases where a defendant's identity as the perpetrator is an issue and the nickname is a piece of evidence that may prove identity. See, e.g., State v. Edwards, XXXX-XXXX (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). In the instant case, the identity of the defendant as an active participant in this crime was clear, so identity was not at issue. Given that Scroggins was not a witness at trial and that no other witness called the defendant "Killa" or "Killer," there was little purpose to eliciting this nickname other than to prejudice the jury against the defendant, and the prosecutor should not have done so.
La. C.Cr.P. art. 770 provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
. . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
. . .
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
La. C.Cr.P. art. 771 provides, in part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during *1143 the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
. . .
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A law enforcement officer is not one of those persons who falls within the ambit of La. C.Cr.P. art. 770, so La. C.Cr.P. art. 771 applies. State v. Harris, 625 So.2d 228 (La.App. 2 Cir.1993). As this court stated in Harris:
Thus, a mistrial may be granted under LSA-C.Cr.P. Art. 771 when an admonition is deemed to be insufficient to assure the defendant a fair trial. A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to the defendant sufficient to deprive him of a fair trial. Article 771 places the decision of whether to grant a mistrial or to admonish the jury within the sound discretion of the trial court. This decision will not be disturbed absent a showing of a manifest abuse of discretion. (Citation omitted)
Factors which may be considered in determining whether a mistrial is warranted are whether the statement was deliberately elicited by the district attorney, whether it was responsive to the question, and whether the witness purposely uttered it to prejudice the defendant. State v. Gene, 587 So.2d 18 (La.App. 2 Cir.1991), writ denied, 604 So.2d 993 (La.1992). In this case, the statement was elicited by the prosecutor, the answer was directly responsive to the question and there was little purpose to the remark except to prejudice the defendant.
However, the trial court believed that the admonition was sufficient to cure the prejudicial effect of this testimony, and the circumstances support that ruling. The admonishment described the nickname as the "alleged" nickname, and that is accurate; none of the other witnesses called the defendant "Killa." Further, the jury heard that the nickname was only found "in the reports" suggesting that it was only hearsay. Although the prosecutor should not have elicited the remark, in the final analysis the verdict was surely unattributable to the error. This assignment of error is without merit.
Motion to Suppress
By his seventh assignment of error, the appellant complains that the trial court erred in denying Wilson's motion to suppress his inculpatory statement.
Several days after the murder the defendant gave a statement to CPSO. This statement was played for the jury at this trial. Before trial, the defendant filed a motion to suppress that statement; a hearing was held on the motion on March 11, 2002. The trial court concluded that the defendant knowingly and voluntarily waived his rights when he spoke to the detectives. Wilson alleges on appeal that this ruling was in error.
At the suppression hearing, several law enforcement officers, and Wilson himself, testified. Wilson first came to be interviewed on December 27, 2000, after the Shreveport Police Department called CPSO to tell them that two persons had come into the police department to talk *1144 about these crimes. Wilson had appeared at the police station with Derrick Bouya's girlfriend, Crystal Anderson. Wilson gave CPSO investigator Kay Ward a false name, but Anderson told the detective of Wilson's true identity. Thereafter, Ward took Wilson, in handcuffs, to a CPSO office so he could make a statement; Ward did not interview him or tell him what he was going to be asked about.
When Wilson arrived at CPSO, he sat with CPSO detective Jeff Ivey. Ivey read Wilson his rights and then the two waited for Detective Hensley to be available to interview Wilson. Wilson told Ivey that he shot Ms. McGraw in the head.
After perhaps two or three hours, Wilson met with Detective Hensley and Detective Jason Morgan. Wilson signed a Miranda form in two places, signifying that he had been advised of his rights and that he wished to waive his rights and make a statement. Detective Hensley told him that by signing the form, "That means you're willing to talk to me about this credit card theft and we're gonna talk about a homicide, okay?" At the top of this form is a preprinted sentence "You are under arrest for your part in the offense of" and underneath that sentence, there is a blank line. Nothing is filled in on the blank. Detective Hensley said that nothing was filled in because he did not at that point know what Wilson was arrested for. The detectives did not tell Wilson that he was under arrest for first degree murder, but, in addition to the quoted sentence above, they told him that they wanted to speak with him about "a credit card theft that subsequently ended up these credit cards belonged to a homicide victim." The form states that the time and date is 0326 AM on December 28, 2000.
On May 29, 2002, the court ruled from the bench on the defendant's motion to suppress. The court concluded that Wilson's statement was admissible because he knowingly waived his rights and that there was no requirement that the detectives tell Wilson that he was under arrest for first degree murder. The defendant now appeals that ruling.
In State v. Brown, XXXX-XXXX (La.4/12/05), 907 So.2d 1, the supreme court explained the test for the admission of a confession and the standard of review to be applied to the trial court's determination:
As a general matter, before a confession may be admitted into evidence, the State has the burden of affirmatively showing that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. See R.S. 15:451; State v. West, 408 So.2d 1302, 1307 (La.1982); State v. Dewey, 408 So.2d 1255, 1258 (La.1982). Furthermore, if the statement was made during custodial interrogation, the State must show that the defendant was advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, 403 So.2d 1157, 1159 (La.1981); See State v. Sonnier, 379 So.2d 1336, 1355 (La. 1979). Once a suspect in custody expresses a desire, at any stage in the process, to interact with the police only through counsel, all questioning must cease and the accused may not be subjected to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police, and validly waives his earlier request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); Miranda, 384 U.S. at 440-445, 86 S.Ct. at 1612. The admissibility of a confession is a *1145 question for the trial judge, whose conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence. State v. Jackson, 381 So.2d 485, 487 (La.1980).
See also State v. Caston, 40,054 (La.App. 2 Cir. 9/28/05), 912 So.2d 413. In this case the record shows that the trial court's decision to admit the statement was correct. Defendant was informed of his rights per Miranda and indicated his understanding of those rights, and at no point did the defendant ask to speak to police through an attorney. Although defendant complains that he would not have made the statement if he had known he was under arrest for first degree murder, the circumstances surrounding the making of the statement completely destroy any claim that he was unaware of what was happening. The defendant initiated contact with police and, using a false name, attempted to provide an alibi for his accomplices and, by extension, himself, for the homicide. His futile effort to deceive police demonstrates his understanding that he potentially faced serious consequences for his actions. Further, investigators informed Wilson at the outset that they were investigating a credit card theft from a homicide victim, and they simply asked Wilson to tell them what he knew about the situation; there was no effort to mislead him into thinking that his statement could or would not lead to further criminal proceedings. The record shows no form of coercion; indeed, Wilson appears to have been eager to talk to investigators and explain his actions. The confession was clearly freely and voluntarily given.
This assignment of error is without merit.
Jury Charges
By his ninth assignment of error, appellant complains that the trial court's reasonable doubt instruction and the prosecutor's repeated explanations of reasonable doubt impermissibly lowered the state's burden of proof, thereby requiring reversal of his conviction. He also complains that the prosecutor tainted the jury during voir dire by reciting this allegedly improper definition of reasonable doubt in questioning the jurors.
The defendant's attorney specifically stated that he had no objection to the jury charge. The state urges that the failure to object waives this error, but an error in the charge on reasonable doubt risks being a structural error and even if waived under state law grounds merits some discussion.
This court considered and upheld a reasonable doubt instruction essentially identical to the instruction in this case in State v. Gaddis, 36,661 (La.App. 2 Cir. 3/14/03), 839 So.2d 1258, writ denied, XXXX-XXXX (La.5/14/04), 872 So.2d 519, cert. denied, 544 U.S. 926, 125 S.Ct. 1649, 161 L.Ed.2d 487 (2005).
Since this court has addressed this identical instruction in Gaddis and found no constitutional infirmity, and since the defendant's argument in this case is identical to the argument in Gaddis, there is no reason to revisit the issue. This assignment of error is without merit.
Sentencing Issues
Finally, by his tenth assignment of error, appellant contends that his sentence of life imprisonment without the possibility of parole, probation or suspension of sentence is unconstitutionally disproportionate.
After vacating Wilson's death sentence, the Louisiana Supreme Court directed the district court to sentence Wilson to serve *1146 life imprisonment at hard labor without the benefits of probation, parole or suspension of sentence. The court held a sentencing hearing on June 6, 2005, at which time Wilson's attorney asked the court to impose a sentence below the mandatory life term due to the mitigating factor of the defendant's youth and because, allegedly, life sentences were disproportionately imposed upon black juvenile offenders in Louisiana. On June 22, 2005, the court signed a resentencing order imposing the life sentence. The defendant filed a motion to reconsider sentence on July 12, 2005, arguing that the imposition of a life sentence on him was cruel and unusual punishment and constitutionally excessive and that a hearing for the presentation of mitigating factors was required. The trial court denied the motion without a hearing
The court gave no specific reasons for denying the motion to reconsider sentence. Where there is a mandatory sentence, there is no need for the trial court to justify, under Article 894.1, a sentence it is legally required to impose. State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219; State v. Koon, 31,177 (La.App. 2 Cir. 2/24/99), 730 So.2d 503.
There is no proportionality guarantee in non-capital cases unless the reviewing court finds the sentence is grossly disproportionate to the circumstances of the offense. See Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), in which the court ruled "the Eighth Amendment contains no proportionality guarantee." Accord, State v. Delaughter, 29,974 (La.App. 2 Cir. 12/10/97), 703 So.2d 1364, writ denied, XXXX-XXXX (La.5/1/98), 805 So.2d 201.
A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, XXXX-XXXX (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992).
Life-without-benefits sentences have been affirmed for offenders younger than the defendant. For example, in State v. Pilcher, 27,085 (La.App. 2 Cir. 5/10/95), 655 So.2d 636, writ denied, 95-1481 (La.11/13/95), 662 So.2d 466, this court affirmed the imposition of two consecutive life-without-benefits sentences for a 15-year-old convicted of two counts of second degree murder.
In the instant case, the defendant was saved from execution only by the fortuitous (for him) happenstance that his 18th birthday remained a little more than a month away when he kidnapped, robbed, brutally raped and senselessly murdered the victim. When imposing the death sentence upon the defendant, the trial court made these comments, which are apposite in considering whether the defendant's life sentence is appropriate:
But now my comments to you before I sentence you. I probably heard as much as anyone else from your statements before this court and I can't understand why this happened. I can't imagine what you were thinking, what you were feeling, or what possessed you to do what you did. I was not at all, I think as others, impressed with your statements before this Court. I don't think you showed any remorse. I don't think you are apologetic. I don't think you have any sorrow whatsoever for *1147 what you did to the victim and the victim's family.
I think somewhere you missed the boat. You come from a good family, you've been given opportunities that many people don't get or haven't gotten and probably will not get. And as [your attorneys] presented to the jury, there [were] just certain mitigating factors which you would think would lead this Court or specifically the jury to spare your life for what you did. I can tell you, you didn't impress me and I feel comfortable in saying you did not impress the jury that you were sorry, that you had any regrets or remorse for your actions, because there's no way we could find any excuses.
I'm taking the time because this bothers me to have to do what I'm about to do. This is not a part of the job that I really care to participate in. When I took the oath to uphold the law and fulfill the responsibilities of this honorable position, I never wanted to get to this point, and I don't like it. But what you did was so wrong, so inhumane, so terrible that I think the punishment fits the crime.
I know you are standing before this Court not caring what I'm saying. I could have come in, pronounced the sentence and that could have been the end of it, but I think you need to at some point say to your lawyers, as I've already said, to thank them for at least giving you your day before this Court. I don't think there's anything you could ever say to the victim's family that they would believe that you are sorry. There's nothing you could tell this Court to make this court believe that you are sorry.
The jury and the trial court had the best opportunity to observe this defendant and it was their opinion that a sentence of death was appropriate for this defendant. Given the mindless brutality of this incident, the life-without-benefits sentence is not grossly disproportionate to the crime.
This assignment of error is without merit.

CONCLUSION
For the reasons stated herein above, the conviction and sentence of the defendant are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The state allowed Bouya to plead guilty to second degree murder in exchange for his testimony; he testified at the penalty phase of the trial.
[2] A copy of the Russian AK-47 assault rifle.
[3] For reasons not clear from the record, the sole African-American male was not among 35 members in the pool from which the jurors were selected.
[4] In capital cases, the state and the defendant each have 12 peremptory challenges. La. C.Cr.P. art. 799.
[5] The defense struck 10 female prospective jurors (9 white females and 1 black female), and 11 of its 12 allotted strikes were against white prospective jurors.
[6] Defense counsel was quite candid in expressing his concern that white females might identify with the victim more readily.
[7] The phrase "Emphasis added" appears in the original.
[8] The phrase "Emphasis added" appears in the original.
[9] Students in grades 6 through 12 who have been expelled from their school in their district may attend Hamilton Terrace Learning Center.
[10] Art. 795. Time for challenges; method; racially based peremptory challenges; restrictions

* * *
C. No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
D. The court shall allow to stand each peremptory challenge exercised for a racially neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.
[11] Although the trial court stated in its written opinion that both parties had sufficiently convinced the court that a prima facie case of race and gender discrimination had been established, in fact, there was no such ruling at the actual Batson hearing.
[12] Although the word "not" is missing from the transcript, it is obvious from the context that the court reporter must have inadvertently left the word out.
[13] Interestingly, the defense had already conceded that the state had given a valid, race-neutral reason for striking Ms. Lewis, and it offered no evidence or argument of racial bias other than she was one of the eight African-American jurors struck by the prosecutor.
[14] By contrast, we note that defense counsel candidly admitted that it was striking white females largely because the victim was a white female and he feared they would be far less reluctant to impose a death sentence.
[15] Even though the issue of whether the state purposefully struck African-Americans for racial reasons is a separate issue from whether the defense purposefully struck white females for racial reasons, it must be recognized that the defense is largely responsible for the lack of white females on the jury.
[16] Defense counsel's intent to strike was based on his belief that white females would be inclined to impose the death penalty.
[17] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).