## NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

*JEW*

*chp*
*Wicz*

NO. 2022 KA 0314

## STATE OF LOUISIANA

### VERSUS

## DKERIAN THOMPSON

*Judgment Rendered:* __JAN 1 0 2023__

* * * * * * * *

Appealed from the
21st Judicial District Court
In and for the Parish of Tangipahoa
State of Louisiana
Case No. 1701099

The Honorable Erika Sledge, Judge Presiding

* * * * * * * *

Scott M. Perrilloux
District Attorney
Brett Sommer
Assistant District Attorney
Amite, LA

Counsel for Appellee
State of Louisiana

Katherine Franks
Madisonville, LA

Counsel for Defendant/Appellant
Dkerian Thompson

* * * * * * * *

BEFORE: WELCH, PENZATO, AND LANIER, JJ.

**LANIER, J.**

The defendant, Dkerian Thompson, was charged by grand jury indictment with one count of second degree murder, in violation of La. R.S. 14:30.1(A)(2), to which he pled not guilty.[1] Following a trial by jury, the defendant, who was seventeen years old at the time of the offense, was found guilty of second degree murder. The trial court denied the defendant's motion for new trial and motion for post-verdict judgment of acquittal, and sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

The defendant now appeals, designating five assignments of error: (1) the State improperly exercised peremptory challenges against prospective jurors on the basis of race; (2) the introduction of a witness's prior recorded statement through the testimony of an investigating officer, rather than through the witness himself, violated the defendant's right to confront witnesses against him; (3) the statement of a non-testifying witness, offered through the testimony of the investigating officer, was inadmissible hearsay; (4) the admission of a non-testifying witness's identification of the defendant was improper; and (5) the trial court erred in sentencing the defendant, who was a juvenile at the time of the offense, to life imprisonment without the possibility of parole, probation, or suspension of sentence.

For the following reasons, we affirm the conviction, amend the sentence to life imprisonment with the possibility of parole, probation, or suspension of sentence, pursuant to La. R.S. 15:574.4(G), and as amended, we affirm the sentence, and remand with instructions.

## FACTS

---

[1] Also indicted for second degree murder were co-defendants Tony Johnson, Jr., Jeremiah Ray, and Shauna Broussard. The State tried the defendants separately.

2

On August 18, 2016, the victim, Christopher Franklin, returned home from his place of work at the Fastlane Carwash in Hammond, Louisiana. Mr. Franklin lived with his sister, Jeannette Scott, and her boyfriend, Don Tolbert, at 213 Methvien Drive in Ponchatoula, Louisiana. When Ms. Scott returned home from work at approximately midnight on August 19, 2016, she noticed that the front door and a window were both open, and the window screen was on the ground. After calling the victim's name and hearing no response, Ms. Scott called her stepfather and boyfriend to tell them that something was not right. Ms. Scott's stepfather, Lyntrell Hemphill, told her to drive to the nearby Wal-Mart where he met her a few minutes later. They returned to 213 Methvien Drive, whereupon Mr. Hemphill and Mr. Tolbert entered the residence. Shortly thereafter, the victim's body was found on the floor of his bedroom with a fatal shotgun wound to his head.

The Ponchatoula Police Department's investigation of the victim's death stalled, without generating a suspect. However, in February of 2017, Ponchatoula Police Detective R.J. Hill was contacted by the Louisiana State Police Crime Lab, who notified him that some of the fingerprints collected at 213 Methvien Drive were identified as a match to a man named Tony Johnson, Jr., who was currently incarcerated in Livingston Parish. At that point, Special Agent Matt Vasquez with the Louisiana Bureau of Investigation was brought in to assist in the investigation. They began by interviewing Mario Tate, a neighbor who lived next door to the victim and who witnessed some of the events that transpired the night of his death. In a recorded statement, Mr. Tate informed the officers that he was sitting in his vehicle on the night of the victim's murder when he saw a pickup truck pass the residence twice before stopping nearby. Mr. Tate stated he saw two males, a tall one holding a shotgun and a shorter one holding a handgun, get out of the passenger side of the vehicle. He then saw them remove a screen, open the front

window, and climb inside the house. A few minutes later, Mr. Tate observed them running out the front door of the home.

After interviewing Mr. Tate, the officers travelled to Livingston Parish to interview Mr. Johnson, whose fingerprints were found on the window at 213 Methvien Drive. During the first interview, Mr. Johnson denied any involvement in the victim's death. However, after he was informed that a witness saw two people enter the house through the front window, and that his fingerprints were found on that window, Mr. Johnson requested his attorney and the interview ceased. At that point, Mr. Johnson was arrested and booked for the murder of Christopher Franklin. While there, the officers obtained Mr. Johnson's DNA sample.

After departing the jail, the officers received a call that Mr. Johnson wished to speak to them again. Once the officers returned, Mr. Johnson revoked his previous request for his attorney's presence and proceeded to detail his involvement in the victim's murder. Mr. Johnson stated that he did not know the name of the person who went into the home with him, referring to him only by his nickname, "Lah Juice." Mr. Johnson stated that the other two people with them that night were a female named Shauna and Lah Juice's brother, "Lah Jay." Mr. Johnson pulled up the Facebook accounts of Lah Juice, Lah Jay, and Shauna, and provided the officers with their pictures.

The officers attempted to locate Lah Juice by looking through his social media and photographs, wherein they discerned that Lah Juice attended Hammond High School. Using the photographs, administrators at Hammond High School were able to identify Lah Juice as the defendant, Dkerian Thompson, and Lah Jay as the defendant's brother, Jeremiah Ray. The officers then returned to Livingston Parish to speak with Mr. Johnson about the information they gathered. Mr. Johnson confirmed that the defendant was the person who entered the home with

him, and that Shauna Broussard and Jeremiah Ray were also in the vehicle that night.

Pursuant to the information provided by Mr. Johnson, the officers issued arrest warrants for the defendant, Ms. Broussard, and Mr. Ray for the murder of Christopher Franklin.

## ASSIGNMENT OF ERROR No. 1

In his first assignment of error, the defendant argues that the State improperly exercised peremptory challenges against prospective jurors on the basis of race.

In **Batson v. Kentucky**, 476 U.S. 79, 93-98, 106 S.Ct. 1712, 1721-1724, 90 L.Ed.2d 69 (1986), the United States Supreme Court adopted a three-step analysis to determine whether the constitutional rights of a defendant or prospective jurors have been infringed upon by impermissible discriminatory practices. First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. **State v. Handon**, 2006-0131 (La. App. 1st Cir. 12/28/06), 952 So.2d 53, 56, see also **Foster v. Chatman**, 578 U.S. 488, 499, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1 (2016). The Constitution forbids striking even a single prospective juror for a discriminatory purpose. **Foster**, 578 U.S. at 499.

The race-neutral reasons for excusal need not present an explanation that is persuasive, or even plausible; unless a discriminatory intent is inherent in the State's explanation after review of the entire record, the reason offered will be deemed race-neutral. **Handon**, 952 So.2d at 58. For a **Batson** challenge to succeed, it is not enough that a discriminatory result be evidenced; rather, the result

5

must ultimately be traced to a prohibited discriminatory purpose. Thus, the sole focus of the **Batson** inquiry is upon the intent of the opposing party at the time he exercised his peremptory strikes. See **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 287. A reviewing court owes the trial court's evaluation of discriminatory intent great deference, and should not reverse it unless it is clearly erroneous. **Handon**, 952 So.2d at 58. See also **State v. Jackson**, 2016-1565 (La. App. 1st Cir. 10/12/17), 232 So.3d 628, 633, writ denied, 2017-1944 (La. 5/25/18), 243 So.3d 566.

The defendant raised a **Batson** challenge after the State exercised its third peremptory challenge. At that point, the State had exercised each of its three peremptory challenges to excuse African American jurors; namely, Michelle Jackson, Tidy Jones, and Datia Drake. The State proceeded to offer race-neutral explanations for its use of peremptory strikes absent an affirmative finding from the trial court that the defense had satisfied its *prima facie* burden.

## 1. Michelle Jackson

With respect to Michelle Jackson, the State argued that according to Ms. Jackson's Facebook account, Ms. Jackson "has very unsavory posts concerning police officers and their safety." The State did not present any evidence of Ms. Jackson's Facebook posts, other than its own assertions. The defendant did not object to those assertions, but only re-urged his **Batson** challenge.[2] The State

---

[2] The defendant during *voir dire* also asked Ms. Jackson:

> Q:    [I]f there isn't any scientific evidence, would you be able to return a verdict of guilty if you believe the State's eyewitness?
> A:    No, sir.
> Q:    You would not. So you would require some type of scientific evidence?
> A:    Most definitely.

The defendant then attempted to rehabilitate Ms. Jackson by asking:

> Q:    But if the judge were to tell you in Louisiana, the State is not required to put on any form of DNA or fingerprints … if you believe one witness and you believe that that witness is credible … you can believe that witness and return a verdict of guilty … Is that something you can follow or not?
> A:    I cannot.

contended that Ms. Jackson's Facebook account contradicted her previous testimony regarding her attitude towards law enforcement, wherein she stated the following in response to the State's questioning:

Q:   . . . How do you feel about police officers and me calling police officers to the stand? Have you had a wonderful relationship with police officers in the past?
A:   I don't bother them and they don't bother me.
Q:   Have you ever gotten any traffic tickets?
A:   Yeah.
Q:   And how were those experiences?
A:   I said, give me my ticket and let me go.
Q:   At this point, though, you will not hold any bad experiences against these police officers?
A:   No, ma'am.

While Ms. Jackson stated that she would not hold any personal experiences against the law enforcement officers testifying in this case, hostility towards law enforcement is a valid race-neutral explanation for striking a prospective juror. See **State v. Wilson**, 40,767 (La. App. 2d Cir. 8/23/06), 938 So.2d 1111, 1135, writ denied, 2006-2323 (La. 4/20/07), 954 So.2d 159, cert. denied, 552 U.S. 917, 128 S.Ct. 275, 169 L.Ed.2d 201 (2007) (finding that striking a prospective juror who expressed hostility toward the police was a race-neutral reason, particularly where law enforcement witnesses were scheduled to testify).

**2. Tidy Jones**

As to Ms. Jones, the State argued that she "was completely confused every time that I would ask her a question[,]" and could not remember the questions which were being asked to the panel. The record reflects that after being asked more than once by the State if, after it were proven beyond a reasonable doubt that the defendant was guilty, she could return a verdict of guilty, Ms. Jones appeared

---

We find this to be a race-neutral reason for excluding Ms. Jackson; however, the State did not present this reason during the **Batson** challenge. Nevertheless, the trial court would have known of this race-neutral basis for excusing Ms. Jackson. Since we must give the trial court great deference in evaluating discriminatory intent, we do not find any clear error on the part of the trial court for denying the **Batson** challenge with respect to Ms. Jackson. See **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 600, cert. denied, 522 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).

confused by the questions and gave conflicting responses. Ultimately, it was unclear whether Ms. Jones could render a verdict of either guilty or not guilty. We find that weakness or hesitancy to render a verdict to be a valid race-neutral explanation for striking Ms. Jones. See **Green**, 655 So.2d at 289 (finding that striking a prospective juror who expressed weakness in her willingness to apply the death penalty was a race-neutral reason).

### 3. Datia Drake

Although the State did not address its peremptory challenge of Ms. Drake following the defendant's **Batson** challenge, the State previously attempted to strike Ms. Drake for cause, citing that Ms. Drake "has too much going on in her mind and she is all over the place." Ms. Drake explained that she was working on her master's degree and had assignments due, and that she was preoccupied with work being done on her home due to hurricane damage. The record indeed reflects that Ms. Drake previously testified that she was "mentally all over the place" due to her ongoing school commitments and home repairs.

In response to the State's proffered race-neutral explanations, the defendant argued only that the State's reasons were "generic" in nature, and that other jurors who had answered similarly to the stricken jurors were rehabilitated. He did not offer any facts or circumstances to support an inference that the State exercised its strikes against the three prospective jurors in a racially discriminatory manner.

The trial court denied the defendant's objection, stating that Ms. Drake's concerns about her schoolwork and the work being done at her home were an acceptable race-neutral explanation. The trial court did not address the explanations offered for Ms. Jackson or Ms. Jones. Nonetheless, after reviewing the record as a whole and considering the totality of the circumstances, we find that the State's race-neutral explanations were reasonable, and the proffered rationales had some basis in accepted trial strategy. See **Handon**, 952 So.2d at 59.

8

Therefore, we find that the trial court's acceptance of the State's race-neutral reasons for peremptorily striking Michelle Jackson, Tidy Jones, and Datia Drake was not clearly erroneous. As such, we find no abuse of discretion in the trial court's denial of the defendant's **Batson** challenges regarding these prospective jurors. This assignment of error is without merit.

## ASSIGNMENT OF ERROR No. 2

In his second assignment of error, the defendant argues that the trial court erred in allowing Mario Tate's recorded statement to be introduced through the testimony of Special Agent Matt Vasquez even though Mr. Tate was an available witness. Specifically, the defendant argues that introduction of the statement through a witness other than Mr. Tate deprived the defendant of his opportunity to confront Mr. Tate regarding his prior statement.

Louisiana Code of Evidence article 607 permits the introduction of a prior inconsistent statement, even though it is inadmissible hearsay, for the limited purpose of attacking the credibility of a witness. See **State v. Harper**, 2007-0299 (La. App. 1st Cir. 9/5/07), 970 So.2d 592, 601, writ denied, 2007-1921 (La. 2/15/08), 976 So.2d 173. Louisiana Code of Evidence article 607 provides the following, in pertinent part:

> A. **Who may attack credibility.** The credibility of a witness may be attacked by any party, including the party calling him.
> ***
> D. **Attacking credibility extrinsically.** Except as otherwise provided by legislation:
> ***
> (2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

9

When seeking to introduce evidence of a prior inconsistent statement, a proper foundation must be established. Louisiana Code of Evidence article 613 provides:

> Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, corruption, or prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.

In **State v. Harper**, the defendant objected to the State's introduction of two witness statements where the defendant argued that the State failed to provide the proper foundation for the statements, and that the statements were improperly used for their substance rather than for the limited purpose of impeaching the credibility of the witnesses. **Harper**, 970 So.2d at 600-01. At trial, two of the State's witnesses testified that the defendant, who was charged with simple kidnapping, did not have a knife on the night in question. However, both witnesses signed prior written statements indicating that the defendant threatened the victim by holding a knife to her throat. **Id.** After both witnesses acknowledged that they had signed the written statements, the statements were introduced over the defendant's objection. **Id.**

This court found that a proper foundation was laid in accordance with La. Code Evid. art. 613, and that the statements were admissible to attack the credibility of the witnesses, pursuant to La. Code Evid. art. 607(D)(2). Moreover, this court found that, under La. Code Evid. art. 801(D)(1)(a), the statements were not hearsay, and thus, were admissible not only to impeach the witnesses, but as substantive proof of the offense. **Harper**, 970 So.2d at 601.

Despite previously providing a recorded statement to Special Agent Vasquez during the investigation, Mr. Tate was an evasive and reluctant trial witness.[3] Mr.

---

[3] The State requested that Mr. Tate be treated as a hostile witness. However, the defense objected to the State's request and the trial court sustained the objection.

10

Tate was asked repeatedly about what he observed on the night the victim was killed, to which Mr. Tate responded that he could not remember, and that he had nothing to do with what went on that night. Specifically, Mr. Tate was asked whether he saw two people going through the window. Despite having previously described, in considerable detail, witnessing two individuals remove the screen and enter the home through the front window, Mr. Tate testified that the only thing he saw was somebody knocking on the front door with a gun, at which point he ran inside. When questioned about his prior recorded statement, Mr. Tate initially stated that he did not remember giving a statement. However, Mr. Tate later acknowledged during his testimony that he gave a statement to the investigators, although he was unsure whether it was recorded.

The following exchange then occurred between Mr. Tate and the State:

Q:   If I played that statement and it says that you described one as being 5'11 and slim and the other subject was shorter, carrying a handgun, would that be what you recall as to the reason why you ran inside?

A:   I don't believe that that's what happened, ma'am, but you can play the tape. I don't remember nothing being recorded or no tape or nothing with me saying that.

Immediately following this exchange and without introducing Mr. Tate's statement, the State tendered the witness. Mr. Tate was excused following cross-examination, but he was not released from his subpoena. Later in the trial, the State called Special Agent Matt Vasquez to testify. Special Agent Vasquez confirmed that he took Mr. Tate's recorded statement during the course of his investigation, at which point the State, over defense objection, offered Mr. Tate's statement into evidence and played it for the jury.[4]

---

[4] The following discussion took place regarding the defendant's objection:

Defense:   Your Honor, the Defense raises an objection to the statement being played without the [witness's] presence. The [witness] is available. He is not unavailable pursuant to the rules of the

11

A review of the record reflects that a proper foundation was established prior to the introduction of Mr. Tate's statement. Once the foundation was properly established pursuant to La. Code Evid. art. 613, evidence of Mr. Tate's prior inconsistent statement was admissible to attack his credibility. La. Code Evid. art. 607(D)(2). When a non-party witness's credibility is attacked through prior inconsistent statements, the evidence is generally not admissible for its assertive value as substantive evidence of guilt. **State v. Owunta**, 99-1569 (La. 5/26/00), 761 So.2d 528, 529 (per curiam). An exception to this general rule is codified in La. Code Evid. art. 801(D)(1)(a), which provides the following:

> **D. Statements which are not hearsay.** A statement is not hearsay if:
>
> **(1) Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>
> (a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement[.]

---

hearsay exception; and, for those reasons, we would object to his recorded statement being played.

We would take notice that the [witness] was here and testified, although he stated on the record that he couldn't remember certain things. He did testify, making him available; and, for those reasons, we would object to the playing of this record.

The State:    Right. But I couldn't play it with him because he only stated the fact that it was recorded and that he was there to do it, but I needed the officer to say that it was recorded to finish laying my foundation. He admitted to the statement being given and taken.

The Court:    The statement has already been admitted into evidence.

The State:    Right.

The Court:    I'm going to overrule the objection.

Accordingly, the specific nature of the defendant's objection is not apparent from the record, and therefore, it is unclear whether the statements were admitted for impeachment only, or for their assertive value as well. Having failed to specify the grounds for the objection, it is assumed that the statement was admitted for both purposes. See **State v. Rankin**, 42,412 (La. App. 2d Cir. 9/19/07), 965 So.2d 946, 951, writ denied, 2007-2067 (La. 3/7/08), 977 So.2d 897.

12

Here, Mr. Tate testified at trial and was cross-examined regarding the prior statement. Moreover, Mr. Tate's prior statement was inconsistent with his testimony. However, because Mr. Tate's statement was not introduced while Mr. Tate was testifying, but rather was introduced after Mr. Tate's testimony concluded, through the testimony of Special Agent Vasquez, the defendant contends that he was unable to cross-examine Mr. Tate regarding the contents of the statement.

In **State v. Rankin**, 42,412 (La. App. 2d Cir. 9/19/07), 965 So.2d 946, 951, writ denied, 2007-2067 (La. 3/7/08), 977 So.2d 897, the defendant was convicted of the second degree battery of his girlfriend. The girlfriend provided several statements in which she told police that the defendant caused her injuries. However, at trial, she recanted her prior accounts of the incident and denied giving a statement to the police. **Id.** at 947-50. She later acknowledged giving a statement after being confronted with it by the State. **Id.** at 949. Officers with the Mansfield Police Department then testified as to the content of the victim's statements regarding the injuries inflicted upon her by the defendant. **Id.** at 950. The **Rankin** court found that where other facts elicited at trial supported the victim's earlier statements, the trial court did not abuse its discretion in deeming the statements admissible under La. Code Evid. art. 801(D)(1)(a).

The facts in the instant case are similar to **Rankin** where, after the witness acknowledged giving a statement, the contents of the prior inconsistent statement were admitted through the officer to whom the statement was given. Also, like in **Rankin**, additional evidence corroborated the facts offered by Mr. Tate's prior inconsistent statement. Mr. Franklin's sister testified that when she arrived at home after work, the front window screen was laying on the ground. Special Agent Vasquez testified that Mr. Johnson confirmed that two individuals entered the home. And finally, the driver of the vehicle, Ms. Broussard, testified that Mr.

13

Johnson and the defendant went to the victim's house that night, armed with a shotgun and a handgun, to rob him of marijuana. Accordingly, Mr. Tate's prior inconsistent statement was admissible for its substantive value pursuant to La. Code Evid. art. 801(D)(1)(a).

The defendant contends that even if the prior inconsistent statement falls within the exception set forth in La. Code Evid. art. 801(D)(1)(a), it was still inadmissible because it violated the defendant's constitutional right of confrontation.

The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. The confrontation clause of the Louisiana Constitution guarantees an accused in a criminal prosecution the right "to confront and cross-examine the witnesses against him[.]" La. Const. art. I, § 16. In accordance therewith, the United States Supreme Court held in **Crawford v. Washington**, 541 U.S. 36, 68-69, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004), that out-of-court testimonial statements are inadmissible, regardless of whether they are deemed otherwise reliable, unless the witness is unavailable and the defendant had the prior opportunity to cross-examine them. See also **State v. Tsolainos**, 2007-2443 (La. App. 1st Cir. 10/10/08), 997 So.2d 46, 48 (per curiam), writ denied, 2008-2653 (La. 10/09/09), 19 So.3d 6.

The defendant did in fact have the opportunity to confront and cross-examine Mr. Tate as to both his in-court and his out-of-court statements. Moreover, as the defense concedes, Mr. Tate was an available witness, and therefore, nothing precluded the defense from re-calling Mr. Tate to address the contents of his prior inconsistent statement after it was played in full. Accordingly, the admission of Mr. Tate's prior statement did not violate the defendant's right to confront his accusers.

14

Therefore, contrary to the defendant's various assertions, the admission of Mr. Tate's prior statement was not error and this assignment of error lacks merit.

## ASSIGNMENTS OF ERROR Nos. 3 & 4

In his third and fourth assignments of error, the defendant argues that the trial court erred in allowing Special Agent Vasquez to testify as to the content of Mr. Johnson's statements, and specifically to his identification of the defendant.

Special Agent Vasquez testified that Mr. Johnson told him that the defendant, Mr. Ray, and Ms. Broussard were all in the vehicle that went to the victim's apartment, and that the defendant was the person who accompanied him into the home. Special Agent Vasquez then testified that Mr. Johnson showed him Facebook pictures of the defendant, Mr. Ray, and Ms. Broussard. Finally, Special Agent Vasquez testified that when the officers returned to speak with Mr. Johnson after visiting Hammond High School and identifying Lah Juice as the defendant, Mr. Johnson confirmed the identification.

Louisiana Code of Evidence article 801 defines hearsay as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted therein. The improper introduction of hearsay evidence will be considered harmless error if it is determined the hearsay evidence was cumulative and corroborative of other properly admitted evidence and did not contribute to the verdict. **State v. Dantin,** 2019-0407 (La. App. 1st Cir. 12/17/19), 291 So.3d 1096, 1102 (citation omitted).

Initially, with the exception of a preemptive objection to ensure that the State did not elicit testimony regarding the defendant's incriminating social media posts, we note that the defendant failed to object to Special Agent Vasquez's testimony. The defense generally cannot avail itself of an error that was not objected to at the time of the occurrence. La. Code Crim P. art. 841; see also **State v. Arvie,** 505 So.2d 44, 48 (La. 1987).

15

Moreover, a thorough review of the trial transcript reveals that the testimony in question consisted of information relayed to Special Agent Vasquez during his investigation. Such testimonial evidence by a police officer is admissible to explain the sequence of events leading to the defendant's arrest when there is no indication the evidence is presented to prejudice the defendant. **Dantin**, 291 So.3d at 1103, citing **State v. Mitchell**, 2016-0834 (La. App. 1st Cir. 9/21/17), 231 So.3d 710, 726, writ denied, 2017-1890 (La. 8/31/18), 251 So.3d 410.

Here, the testimony was offered to explain how the course of the investigation led officers to the defendant, and there is no indication that it was presented to prejudice him. In fact, the record reflects that both the State and the witness were extremely careful not to elicit or include testimony regarding the content of Mr. Johnson's statement outside the permissible bounds of how that information furthered the investigation.

Furthermore, the testimony was cumulative. Substantial physical evidence tied Mr. Johnson to the crime scene, including his fingerprints, his DNA, and his cell phone location data, all of which substantiated his ability to identify the other individuals who were present that night. Mr. Tate's statement corroborated Mr. Johnson's information that two individuals tried to enter the home. Finally, Ms. Broussard, who was the defendant's girlfriend at the time of the victim's murder, testified in detail regarding the defendant's involvement in the crime. Ms. Broussard testified that the reason that she, the defendant, Mr. Johnson, and Mr. Ray went to the victim's home was because the defendant heard the victim had marijuana, and he wanted to "hit a lick[,]" or rob him of the drugs. She further testified that she was the one who drove the defendant, Mr. Johnson, and Mr. Ray to the victim's house, and that the defendant and Mr. Johnson both got out of the vehicle and walked towards the house. Ms. Broussard testified that a few minutes

later, Mr. Johnson and the defendant came back to the vehicle, at which point she heard Mr. Johnson say "I think I shot him."

Accordingly, even if admission of the complained of testimony was in error, such error was harmless. See La. Code Crim. P. art. 921; **Dantin**, 291 So.3d at 1104.

## ASSIGNMENT OF ERROR No. 5

In his final assignment of error, the defendant contends that the trial court erred in sentencing him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence because he was a juvenile at the time of the offense and the State withdrew its notice of intent to seek a life sentence without parole prior to a hearing on the matter.

A conviction for second degree murder in Louisiana mandates a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1. However, the United States Supreme Court in **Miller v. Alabama**, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) held that a sentencing scheme that mandates life imprisonment without the possibility of parole for juvenile offenders violates the Eighth Amendment prohibition against cruel and unusual punishment. In accordance therewith, the Louisiana legislature specifically amended La. Code Crim. P. art. 878.1 and La. R.S. 15:574.4 to codify **Miller's** holding.

Louisiana Revised Statutes 15:574.4(G) provides, in pertinent part:

(1) Notwithstanding any provision of law to the contrary, any person serving a sentence of life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) who was under the age of eighteen years at the time of the commission of the offense and whose indictment for the offense was prior to August 1, 2017, shall be eligible for parole consideration pursuant to the provisions of this Subsection if a judicial determination has been made that the person is entitled to parole eligibility pursuant to Code of Criminal Procedure Article 878.1(B) and . . . (a) The offender has served twenty-five years of the sentence imposed[.]

17

Louisiana Code of Criminal Procedure article 878.1(B)(1) reads, in pertinent part:

> If an offender was indicted prior to August 1, 2017, for the crime of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) where the offender was under the age of eighteen years at the time of the commission of offense [and] . . . the district attorney fails to timely file the notice of intent [to seek a sentence of life without the possibility of parole], the offender shall be eligible for parole pursuant to R.S. 15:574.4(E) without the need of a judicial determination pursuant to the provisions of this Article.

Louisiana Revised Statutes 15:574.4(E) mandates parole eligibility after twenty-five years for any juvenile serving a life sentence for a conviction of first degree murder, and whose indictment for the offense was on or after August 1, 2017, assuming several additional conditions are met. Louisiana Revised Statutes 15:574.4(F) provides the same mandatory parole eligibility for juveniles convicted of second degree murder.

Here, the defendant was indicted for second degree murder on May 9, 2017, when he was seventeen years old. Although the State initially filed a notice of intent to seek juvenile life without benefit of parole, the State ultimately withdrew its intent prior to a hearing on the matter. Accordingly, under La. Code Crim. P. art. 878.1(B), the defendant is entitled to parole eligibility without the need of a judicial determination, and is not eligible for a life sentence imposed without the possibility of probation, parole, or suspension of sentence. The defendant was sentenced on November 15, 2021, pursuant to the following:

THE COURT: I denied the post-trial motions, and considering all of the evidence that I also heard during trial, the nature of the crime, the factors enumerated in Code of Criminal Procedure 894.1, and the mandatory sentence listed in 14:30.1, I sentence [the defendant] to life imprisonment with hard labor without benefit of probation, parole or suspension of sentence.

I am aware of the mandatory parole eligibility after 25 years due to [the defendant's] age at the time of the offense. So I will order [the defendant] to be remanded to the custody of the

18

<table>
<tr><td>THE STATE:</td><td>Also, Judge, with that being said, whenever you said the sentencing was without benefit of probation, parole or suspension of sentence, you said that you do know about that parole eligibility. I would just ask that in the minutes that you make it clear for the record that you are aware of it, that it is without benefit of probation, parole or suspension of sentence subject to the 25 [year] parole eligibility.</td></tr>
<tr><td>THE COURT:</td><td>Correct. That's what I meant. If I need to state it again, I will. The sentence is life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence; however, I am aware that there's mandatory eligibility after 25 years due to [the defendant's] age at the time of the offense.</td></tr>
</table>

Department of Corrections to begin serving his sentence.

***

The minutes reflect the following sentence:

The court sentenced the defendant to be committed to the LA DEPARTMENT OF CORRECTIONS. The defendant to serve life. Court ordered sentence is to be served without benefit of probation, parole or suspension of sentence. Sentence to be served at Hard Labor. Credit for any and all time served from the date of arrest up until today's date for each and every day that the defendant has actually served. Court informed counsel that she is aware of the defendant eligibility for parole after 25 years.

The State of Louisiana Uniform Sentencing Commitment Order reads that the defendant's sentence is life, and the amount of time to be served without benefit [of probation, parole or suspension of sentence] is also life.

It is apparent from a thorough review of the record that the trial court's intent was to sentence the defendant to life imprisonment at hard labor with the benefit of parole after serving at least twenty-five years. Such a sentence would be in compliance with the mandates of **Miller**, La. R.S. 15:574.4, and La. Code Crim. P. art. 878.1. However, regardless of the trial court's intent, the record reflects that

the defendant was illegally sentenced to life imprisonment without the benefit of parole.

An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. Code Crim. P. art. 882; see also **State v. Crosby**, 54,539 (La. App. 2d Cir. 6/29/22), 342 So.3d 458, 465 (declining to vacate and remand for resentencing and instead amending sentence to life imprisonment with the benefit of parole where juvenile was illegally sentenced to life imprisonment without benefit of parole after pleading guilty to second degree murder); **State v. Clark**, 2020-167 (La App. 5th Cir. 11/18/20), 306 So.3d 619, 638-40, writ denied, 2020-01459 (La. 2/17/21), 310 So.3d 1150 (amending sentence to include parole eligibility after twenty-five years where defendant was a juvenile at the time of the offense and was illegally sentenced to life without the possibility of parole for thirty-five years). Because an appellate court may correct an illegal sentence at any time, we find that the defendant is not entitled to have his sentence vacated and the matter remanded for resentencing. See La. Code Crim. P. art. 882. Rather, we amend the defendant's sentence to life imprisonment at hard labor with the benefit of parole, pursuant to La. Code Crim. P. art. 882 and La. R.S. 15:574.4(G).

For the foregoing reasons, Dkerian Thompson's conviction of the second degree murder of Christopher Franklin is affirmed, but the sentence is amended to reflect life imprisonment with the benefit of parole consideration after serving twenty-five years, pursuant to La. R.S. 15:574.4(G). Further, the Department of Corrections is ordered to revise the defendant's master prison record to reflect that his sentence is no longer without benefit of parole and, in accordance with the criteria in La. R.S. 15:574.4, to reflect an eligibility date for consideration by the Board of Parole once the conditions contained therein are met.

**CONVICTION AFFIRMED; SENTENCE AMENDED TO LIFE WITH BENEFIT OF PAROLE AND AFFIRMED AS AMENDED; REMANDED FOR CORRECTION OF MINUTE ENTRY AND COMMITMENT ORDER.**